UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISON

| | |
|---|---|
| CAFÉ, GELATO & PANINI LLC, d/b/a/ CAFÉ GELATO PANINI, on behalf of itself and all others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| SIMON PROPERTY GROUP, INC., SIMON PROPERTY GROUP, L.P., M.S. MANAGEMENT ASSOCIATES, INC., and THE TOWN CENTER AT BOCA RATON TRUST, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

### I.     INTRODUCTION

1.     When a landlord rents mall space to small businesses, it must follow state laws and regulations that forbid turning providing utilities into a profit center for secret excess rent. Likewise, when a mall landlord promises a tenant in written contract that it will not mark-up its electricity rate, it must honor that contractual obligation.  But Simon Property Group, Inc. ("Simon"), broke these basic rules.  Through a pernicious shell game of corporate entities, Simon for years executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at all of its shopping malls throughout the United States.

2.     Simon conducts its business through Simon Property Group, L.P. ("Simon Partnership") and, through Simon Partnership, owns M.S. Management Associates, Inc. ("M.S. Management").   M.S. Management is responsible for managing Simon's shopping malls nationwide.  Simon creates single purpose entities to own the shopping malls and places those

single purpose entities into holding companies owned by Simon Partnership, with the vast majority of profits and revenues flowing back to Simon from those operations. M.S. Management manages and conducts all the business activities of those single purpose entities.

3.       Simon directed and required M.S. Management to use standard lease agreements that falsely represented that the tenants at the shopping malls it ultimately owned would be charged the amount that the shopping malls were charged by the local utility providers to supply those tenants with electricity.  That is, Simon Partnership, at the direction and behest of Simon, caused M.S. Management to represent to the tenants that the tenants would pay the same amount for electricity that the tenants would pay if they were purchasing the electricity directly from the local utility.  Despite the contractual obligations and representations, Simon, Simon Partnership, M.S. Management, and other unnamed co-conspirators engaged in a racketeering enterprise and conspiracy, breached the lease agreements with tenants, and violated applicable state laws and regulations by inflating the tenants' electric bills.  Sometimes, the fraudulent and illegal markups exceeded 100% of the tenant's actual electricity usage charges.

4.       In an effort to conceal its wrongful and illegal conduct, Simon caused M.S. Management to insert into the lease agreements a clause requiring the tenants at the shopping malls, ultimately owned and controlled by Simon through its holding companies, to waive their right to audit the shopping malls' electric bills in exchange for agreeing that the electricity charges would not be marked-up.  Whenever tenants raised issues about their electricity costs, Simon caused M.S. Management to inform the tenants that they had waived their audit rights under the lease agreement and instructed M.S. Management not to provide the tenants with the actual electricity bills from the utilities, which would have revealed the undisclosed mark-ups.

5.     In furtherance of its fraudulent and illegal scheme, Simon had Valquest, an independent third-party energy company, provide its customers with inflated energy surveys to justify the marked-up electrical charges.  Simons' scheme allowed it to take advantage of the tenants by: (1) fraudulently misrepresenting to them that their electricity charges were not being marked-up; (2) actually having the electrical charges marked-up in contravention of the lease agreement; and (3) covering up that illegal conduct by using the audit waiver provision to shield it from scrutiny. Simon knew it was much bigger, and much better financed than the thousands of small business owners nationwide who rented mall spaces from it.  In exploiting this inequality, Simon used its vast resources and superior negotiating and bargaining power to actively victimize and defraud tenants – simply to reap unfair, improper, and illegal profits.

6.     Plaintiff Café, Gelato & Panini LLC, d/b/a/ Café Gelato Panini ("Café Gelato") was a tenant at The Town Center at Boca Raton ("TCBR"), which Simon owns through a single purpose entity, The Town Center at Boca Raton Trust ("The Trust").  For years Simon, through Simon Partnership, caused M.S. Management and The Trust to lie to Café Gelato by telling Café Gelato that it was only paying its share of the actual electricity charges at TCBR.  In truth, for years Café Gelato was tricked into paying thousands of dollars in illicit electricity mark-ups, the vast majority of which were ultimately paid to Simon.  Café Gelato brings this class action lawsuit on behalf of itself and all other similarly situated current and former tenants to: (1) end Simon's illegal conduct; (2) require that the terms of the lease agreements be honored by charging the tenants at the shopping malls that Simon owns through its holding companies their actual electricity costs going forward; and (3) return to current and former tenants the illegal electricity mark-ups that were charged to them and retained for years on end, as well as appropriate damages, interest, and penalties as permitted under the applicable statutes.

## II.    PARTIES

7.    Plaintiff Café, Gelato & Panini LLC, d/b/a/ Café Gelato Panini ("Café Gelato") is a Florida limited liability company and has its principal place of business in Florida.  Café Gelato is an upscale Italian/Argentinian bistro located at TCBR.  Café Gelato signed a 5-year lease with the Trust for its location at TCBR on October 24, 2014. (Café Gelato Lease, Ex. A). During its lease, Café Gelato received invoices through the United States mail for its electric costs, frequently issued on Simon letterhead, which Café Gelato believed were the amounts charged by the local utility without any mark-up because of the representations contained in the lease agreement. Café Gelato paid the full amount of those invoices.

8.    Simon Property Group, Inc. ("Simon") is a Real Estate Investment Trust ("REIT") headquartered in Indianapolis, Indiana, has its principal place of business in Indiana, and is incorporated under the laws of Delaware.  The shopping mall empire that is Simon Property Group began in 1960, when Melvin Simon, a leasing agent, founded Melvin Simon and Associates ("MSA").  In 1993, MSA took the majority of the assets it had amassed to Wall Street through the formation of Simon Property Group ("SPG"). SPG's $840 million initial public offering was at the time the largest in U.S. history, and the company began trading on the NYSE under the ticker symbol SPG. Today, Simon is the largest REIT in the world. As of December 31, 2019, Simon owned or held interests in over 200 income-producing properties in the United States alone.

9.    Simon Property Group, L.P. ("Simon Partnership") holds, directly or indirectly, substantially all of Simon's assets, including Simon's ownership interests in joint ventures, and conducts substantially all of Simon's business. Simon Partnership is organized under the laws of Delaware, and has its principal place of business in Indianapolis, Indiana.

10.    M.S. Management Associates, Inc. ("M.S. Management") is incorporated under the laws of Delaware and has its principal place of business in Indianapolis, Indiana.  M.S.

Management is one of Simon and Simon Partnership's significant subsidiaries. Simon, through Simon Partnership, uses M.S. Management to conduct its property management and development activities nationwide.  M.S. Management was responsible for managing TCBR.

11.     Simon's revenues are primarily derived from leases with retail tenants and generally include fixed minimum rents, percentages of rents based on tenants' sales volumes, and reimbursements from tenants for expenditures related to real estate taxes, insurance, common area maintenance, electrical charges, and other recoverable operating expenses, as well as certain capital expenditures.  Simon also generates revenues from management, leasing and development fees, sponsorships, sales of peripheral land at its properties and from sales of its real estate assets. The vast majority of the revenues and profits from Simon Partnership, M.S. Management, and the single purpose entities held indirectly by Simon flow directly back to Simon.

12.     The Town Center at Boca Raton Trust ("The Trust") is a New York Trust with its principal place of business in Indianapolis, Indiana.

13.     Simon, Simon Property, M.S. Management, and The Trust are not regulated public utilities or electric utilities subject to the jurisdiction of the Florida Public Service Commission. Regardless, the marking-up of electrical charges is fraudulent conduct separate and distinct from the regulation and sale of electricity.

## III.     JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a), because this is an action for an amount exceeding $5,000,000, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than all of the Defendants.  Subject matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961 *et seq*.  The Court has personal jurisdiction

over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

15.     This Court also has personal jurisdiction over the Defendants, because they continuously and systematically operate, conduct, engage in, and carry on business in Florida by owning, managing, and operating at least 24 retail shopping centers in Florida.  The Court also has specific personal jurisdiction over the Defendants because the Defendants' wrongful conduct occurred in this district.  Accordingly, the Defendants are subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Defendants' registered agent is located in Broward County, Florida, which is in this judicial district.  In addition, Café Gelato's causes of action accrued within this judicial district and a substantial part of the events, acts, and omissions giving rise to Café Gelato's claims occurred here. Furthermore, the Defendants routinely operate and solicit business in this district, and the Defendants' wrongful acts in this district have impacted the general public of this district.

### IV.     FACTUAL ALLEGATIONS

**A.     Café Gelato Entered Into A Lease With The Trust To Rent Retail Space At TCBR.**

17.     Simon, through Simon Partnership, created a single purpose entity, The Trust, which owns TCBR.  TCBR is a retail shopping center featuring over 200 different stores and eateries located in Boca Raton, Florida.  Simon caused Simon Partnership to hold The Trust in one of its holding companies.  TCBR is managed exclusively by M.S. Management, managing the shopping mall, and conducting all other related functions at TCBR.

18.     Julian Mancinelli is the majority member and was the day-to-day manager of Café Gelato.  Mr. Mancinelli works in the retail service industry and has owned and operated various cafes and bistros throughout his career.  Mr. Mancinelli first began operating Café Gelato at TCBR

in 2010. While the rent at TCBR was substantially more expensive than at other locations, Mr.

Mancinelli hoped that the location would increase his sales and allow his business to grow.

19.    On October 24, 2014, Café Gelato and the Trust entered into a 5-year lease

agreement for its retail space at TCBR.  (Attached as Exhibit A).  The leased premises were to be

used and operated as a business in the retail sale of Italian gelato, gourmet Panini's, non-alcoholic

beverages, and bakery products.

20.    Among the various provisions in Café Gelato's lease agreement was the

following:

> Section 7.1 Utilities . . . Tenant shall be solely responsible for and
> promptly pay all charges for use or consumption of sewer, gas,
> electricity, water and all other utility services. **Landlord may make
> electrical service available to the Premises, and so long as
> Landlord continues to provide such electrical service Tenant
> agrees to purchase the same from Landlord and pay Landlord
> for the electrical service (based upon Landlord's determination
> from time to time of Tenant's consumption of electricity),** as
> additional rent, on the first day of each month in advance (and
> prorated for partial months), commencing on the Commencement
> Date **at the same cost as would be charged to Tenant from time
> to time by the utility company which otherwise would furnish
> such services to the Premises if it provided such services and
> metered the same directly to the Premises**, but in no event at a
> cost which is less than the cost Landlord must pay in providing such
> electrical service.

(Ex. A at § 7.1) (emphasis added).

21.    Simon, acting through Simon Partnership, caused M.S. Management and The Trust

to put § 7.1 into the lease agreements that were used at TCBR.  Pursuant to § 7.1 of the lease

agreement, The Trust uniformly promised Plaintiff and every tenant at TCBR that they would be

charged the same for their electricity as if they were being billed directly by the local utility

company.  Accordingly, the tenants were to receive their electricity at the rate paid by The Trust

at TCBR without any additional mark-up. These representations and practices were repeated at Simon malls around the country in a materially uniform manner.

22.     Simon, acting through Simon Partnership, caused M.S. Management and The Trust to also insert an audit waiver provision in the lease agreement requiring the tenants at TCBR to waive any right to audit the invoices and records to determine whether they were actually being charged the correct amount for electricity.  Pursuant to § 6.2 of the lease agreement, "Tenant shall have no right to audit Landlord's books and records . . . ."  (Ex. A at § 6.2).  This practice was repeated at Simon malls around the country in a materially uniform manner.

**B.     Cafe Gelato Attempts To Mitigate Its Exorbitant Electrical Charges.**

23.     Café Gelato made a substantial investment in building out the retail space it rented at TCBR, believing that it would be a profitable location and that Simon would bill Café Gelato for electricity based on the kilowatt hours it actually used at the same rate that it would otherwise be charged, without any mark-up by Simon of the electric rate.  Mr. Mancinelli invested in high-end, energy efficient equipment in order to mitigate his electrical costs.

24.     Shortly after Cafe Gelato opened its location at TCBR, it began receiving as part of its monthly invoice through the U.S. mail a line item cost for electricity. (*See* Café Gelato's Invoice, attached as Exhibit B).

25.     When Café Gelato first began its operations at TCBR, it was relatively profitable due to anticipated foot traffic and other benefits of the location. Because of this, Café Gelato was able to maintain its operations, despite the continuing and unexpectedly-high electricity charges.

26.     Over time, however, the foot traffic at TCBR decreased as consumers began shopping more online, and Cafe Gelato began to see a substantial drop in its revenue.  However, despite this decrease in business and the corresponding decrease in Café Gelato's use of its electrical equipment, the electricity bills that Simon sent Café Gelato through the U.S. mail never

- 8 -

decreased substantially. Indeed, Café Gelato's electricity bills continued to average close to $500 per month.

27.     Cafe Gelato struggled over the next few years as revenues decreased as a result of the reduction of customers visiting TCBR.  During this time, Cafe Gelato did everything it could to cut costs in order to maintain its revenues.

28.     Other than Cafe Gelato's rent, one of its largest business expenses was electricity. Each year, Simon would send purported technicians that surveyed Café Gelato's business location and its electrical equipment supposedly for the purpose of providing a true and accurate estimate of Café Gelato's energy consumption.  But, those electrical estimates were intentionally inflated and the electrical rate intentionally marked-up.

29.     Café Gelato continued to struggle financially as a result of decreased business, high rent, and high electricity bills. When Café Gelato fell behind in its rent payments, it communicated with Simon in good faith for relief, but to no avail. Simon continued to charge Café Gelato high rents and exorbitant electricity charges that eventually became untenable.

**C.     Simon Conspired With Valquest To Inflate Cafe Gelato's Energy Surveys.**

30.     Valquest Systems, Inc. ("Valquest"), is an energy company based in Texas that, among other things, conducts and provides energy surveys and audits.  Simon contracted with Valquest to provide tenants at the various shopping malls that were owned by Simon through its holding companies with energy surveys that were used to project energy costs for a storefront location or to substantiate the energy costs that either M.S. Management or Simon billed and sent its tenants.

31.     Sometime in the second quarter of 2005, Simon entered into an agreement and conspired with Valquest and directed Valquest to artificially inflate the amount of the electricity costs in the energy surveys provided to the tenants that rented space at malls that were owned by

Simon through its holding companies.  Valquest artificially inflated the electricity costs in return for the payments it received from Simon for conducting the falsified energy surveys.  Simon and Valquest knew the Valquest surveys were inaccurate because they inflated the tenants' electricity costs and Simon knew what the true costs were. Indeed, Simon resold electricity to its tenants at rates higher than what it paid per kilowatt hour in violation of Florida law.

32.     For example, even after Cafe Gelato's business and corresponding electricity consumption decreased substantially, Simon continued to provide Café Gelato with charge backup reports that overstated Café Gelato's electricity usage and the electric rate in order to substantiate the marked-up electrical charges.  (*See* Charge Backup Report, attached as Exhibit C).  Simon continued to use the inflated energy surveys to hide its illegal conduct and the illegal conduct of its co-conspirators Valquest, Simon Partnership, M.S. Management, The Trust, and the single purpose entities it created to own its shopping malls.   Simon directly profited from the illegal conduct by knowingly and intentionally marking up Cafe Gelato's electricity charges and also by causing M.S. Management to knowingly and intentionally mark-up Cafe Gelato's electrical charges.  Simon shared those illicit profits with Valquest by paying Valquest's fees for the surveys, even though it knew and intended those surveys to be inaccurate.

**D.     Simon's Fraud Is Revealed At Town Center at Boca Raton.**

33.     In early 2020, Mr. Mancinelli began reviewing the records of his business operations at TCBR and the amounts that Simon had charged him for electricity over time. As a result of this process, Mr. Mancinelli first began to suspect that he had been defrauded.

**E.     Simon Overcharges Tenants Nationwide At The Malls It Owns Through Holding Companies.**

34.     Simon's practice of overcharging the tenants at the malls it owns through its holding companies for electricity is not isolated to TCBR.  Simon has a nationwide policy and practice of

charging the tenants that rent space at the shopping malls it owns through its holding companies in excess of their actual costs for electricity and resold electricity to its tenants at rates higher than what it paid per kilowatt hour, irrespective of the standard and uniform written contracts that it causes M.S. Management to provide to the tenants and of the laws of the states in which Simon operates.

35.     Simon, acting through Simon Partnership, creates single purpose entities to purchase the shopping centers that are held by Simon.  Simon then causes Simon Partnership to hire M.S. Management to operate those shopping centers.   Simon, acting through Simon Partnership, causes M.S. Management and the single purpose entities that own the shopping malls, to insert the equivalent of § 7.1 into each and every lease rental agreement used with the tenants that rent space at their malls.  As noted above, § 7.1 uniformly states that:

> Tenant agrees to . . .  pay Landlord for the electrical service . . . **at the same cost as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises** . . .

(Ex. A at § 7.1) (emphasis added).

36.     Thus, at every mall that Simon owns through its holding companies, they use the same uniform and standard lease agreement that promises the tenants that they would be charged the same for their electricity as if they were being billed directly by the local utility company. Accordingly, the tenants at every shopping mall owned by Simon through its holding companies were to receive their electricity at the cost the shopping mall incurred without any additional mark-up.

37.     Similarly, and as described above, Simon, acting through Simon Partnership, caused M.S. Management and the single purpose entities that nominally owned the shopping malls held in the holding companies, to insert an audit waiver provision in the lease agreement requiring

the tenants at all of those shopping malls to waive any right to audit the invoices and records to determine whether they were actually being charged the correct amount for electricity. Pursuant to § 6.2 or its equivalent of the standard lease agreements, "Tenant shall have no right to audit Landlord's books and records . . . ." (Ex. A at § 6.2).

38.     Simon's conspiracy with Valquest was uniform and nationwide. Simon directly profited from the illegal conduct by knowingly and intentionally causing M.S. Management and its single purpose entities to mark-up the tenants' electrical charges at the malls Simon owned through its holding companies. Simon shared those illicit profits with Valquest by paying Valquest's fees for surveys, even though it knew and intended those surveys to be inaccurate.

39.     Despite the lease rental agreements' promise to charge the tenants at the malls Simon owned through its holding companies no more than what the malls paid for electricity, Simon, through Simon Partnership, caused M.S. Management and the single purpose entities to charge the tenants more for electricity than what the malls actually paid the local utility companies for that electricity. Accordingly, due to Simon's deceitful practice which resulted in the breach of the lease agreements, the tenants at the malls Simon owns through its holding companies suffered significant and substantial damages in excess of $100,000,000.

## V.     CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action against Defendants pursuant to Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, on behalf of itself and all other persons and entities similarly situated. Plaintiff seeks certification of the following classes (referred to collectively as the "Class"):

> **The Nationwide Class**
>
> All tenants at shopping malls managed by M.S. Management whose electricity charges were determined based on a Valquest survey within the applicable limitations period.

Excluded from the Nationwide Class are Simon, Simon Partnership, M.S. Management, and The Trust and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

**The Florida Statutory Class**

All tenants at shopping malls in Florida managed by M.S. Management whose electricity charges were determined based on a Valquest survey within the applicable limitations period.

Excluded from the Florida Statutory Class are Simon, Simon Partnership, M.S. Management, and The Trust and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

**The TCBR Class**

All tenants at TCBR whose electricity charges were determined based on a Valquest survey within the applicable limitations period.

Excluded from the TCBR Class are Simon, Simon Partnership, Simon Management, and The Trust and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

## A.  Numerosity

41.  The Nationwide Class consists of thousands of current and former tenants who entered into lease agreements at shopping malls managed by M.S. Management and ultimately owned by Simon through its holding companies for the purpose of using the premises for retail activities and related services.  The Florida Statutory Class consists of thousands of current and former tenants at malls managed by M.S. Management in Florida who were charged more than their actual electricity costs for their electricity use at those malls.  Finally, the TCBR Class consists of hundreds of current and former tenants at TCBR who were charged more than their actual electrical costs at TCBR.

42.  The names and addresses of all Class members can be identified in the business records maintained by the Defendants.  The precise number of Class members will be obtained

through discovery but based on publicly available information, the numbers are clearly more than can be consolidated in one action, and it is impractical for each Class member to bring suit individually.  For example, Simon's annual reports indicates that it owns over 200 mall properties across the United States, including 24 mall properties in Florida.  Those malls contain tens of millions of rentable square feet.  As a result, there are likely hundreds of TCBR Class members, thousands of Florida Statutory Class members, and at least tens of thousands of Nationwide Class members, and due to turnover, the actual number of current and former tenants who are Class members is likely a multiple of that amount.  The Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**B.**     **Commonality**

43.     There are questions of law and fact that are common to the claims of Plaintiff and the Class.  These common questions predominate over any questions that are particular to any individual Class member.  Among such common questions of law and fact are the following:

a.     Whether the Defendants marked up the electric rates that they charged the Class members;

b.     Whether The Trust breached its lease agreements by charging the TCBR Class members for electricity in excess of what The Trust paid the electric utility for that electricity;

c.     Whether The Trust breached the implied covenant of good faith and fair dealing in its lease agreements when it charged the TCBR Class members amounts for electricity greater than what The Trust paid the electric utility for that electricity;

d.     Whether the Defendants were unjustly enriched by receiving the profits from overcharged Class members for electricity in excess of the actual amounts charged by the electric utilities for that electricity;

e.     Whether the Defendants engaged in a deceptive and unfair business practice by misleading the Class members by causing M.S. Management to put in the lease agreement that it would not charge the tenants in excess of the actual costs for electricity and then causing M.S. Management to charge them amounts in excess of the actual electricity costs;

f.  Whether Defendants have a policy or practice of overcharging the Class members for energy costs at all of the locations owned by Simon through its holding companies in direct contravention of the lease agreements;

g.  Whether the Defendants in conjunction with Valquest formed a criminal enterprise with the intention of overcharging the Class members for electricity;

h.  Whether the Defendants violated 18 U.S.C. § 1962;

i.  Whether the Defendants violated Florida's Civil RICO statutes; and

j.  The amount of damage the Class members sustained as a result of the Defendants' wrongful conduct, and the proper measure of such damage.

### C.    Typicality

44.    Plaintiff's claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained damages as a result of the Defendants' wrongful conduct in the same manner as the Plaintiff – that is, each Class member was charged in excess of what the actual costs were for electricity, contrary to: (1) the express terms of the uniform lease agreements where those agreements required that the Class members be charged no more than what the shopping malls paid the utility for that electricity; and (2) applicable law.

### D.    Adequacy of Representation

45.    Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it.  There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

46.     To prosecute this case, Plaintiff has chosen the law firms of Buckner + Miles and Kelley Uustal. These law firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**E.     Requirements of Fed. R. Civ. P. 23(b)(3)**

**1.     Predominance**

47.     The questions of law or fact common to the claims of the Plaintiff and the Class predominate over any questions of law or fact affecting only individual members of the Class.  All claims by Plaintiff and the unnamed Class members are based on the Defendants' deceitful practice of charging the Class members more than what the Defendants' shopping malls paid the utilities for electricity, in breach of the express terms of the common form lease agreements and applicable state law.

48.     Common issues predominate when, as here, liability can be determined on a Class-wide basis.

49.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

50.     Because all claims by Plaintiff and the unnamed Class members are based on the same misconduct by the Defendants, in particular, that the Defendants charged the Class members more than what the malls paid for electricity—in direct contravention of the express terms of the lease agreements — the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

**2.     Superiority**

51.     A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

a.     Joinder of all Class members would create extreme hardship and inconvenience because of their geographical dispersion. Class members reside throughout the United States.

b.     Individual claims by the Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  The Defendants are large and well-funded.  Moreover, some of the Class members have ongoing contractual relationships with some of the Defendants, which may make some Class members fearful or reluctant to pursue their claims, even if they had the resources to do so.  As a result, individual Class members are unable to prosecute and control separate actions.

c.     The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

d.     The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**ACT ("RICO"), 18 U.S.C. § 1962(A), (C)-(D))**
**SIMON, SIMON PARTNERSHIP, M.S. MANAGEMENT**
**AND THE TRUST**
**(ON BEHALF OF ALL CLASSES)**

52.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     Simon conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  Plaintiff brings this count on behalf of the Nationwide Class, the Florida Statutory Class, and the TCBR Class against Simon, Simon Partnership, M.S. Management, and The Trust.  At all relevant times, Simon, Simon Partnership, M.S. Management, The Trust, and Valquest have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

54.     Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an

unlawful debt in which such person has participated as a principal within the meaning of section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

55.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

56.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Sections 1962(a) and (c), among other provisions.  18 U.S.C. § 1962(d).

57.     For many years, Simon sought to illegally increase its profits by wrongfully inflating the cost of electricity to the tenants that rented space at the shopping malls it owned through its holding companies.  Simon exercised control over Simon Partnership.  Simon, through Simon Partnership, created holding companies to hold the single purpose entities it created for each shopping mall it purchased.  Simon also created M.S. Management, which is owned by Simon and Simon Partnership, and manages Simon's shopping malls.  For example, Simon caused Simon Partnership to use The Trust, a single purpose entity to own TCBR, which is held in one of Simon's holding companies.  TCBR was managed by M.S. Management. In order to hide its illegal conduct from scrutiny, Simon caused Simon Partnership to require M.S. Management and the single purpose entities it created to own the shopping malls to include a lease provision in the lease agreement requiring tenants to relinquish their right to audit the shopping mall's electrical charges.

58.     As part of the enterprise, Simon also conspired with Valquest, an energy company that, among other things, conducts energy surveys, that were used to defraud Plaintiff and of the Classes.  Simon contracted with Valquest to provide false electrical audits to Plaintiff and all of the Classes in order to falsely justify and conceal the inflated electrical charges.

59.     Valquest knowingly and intentionally assisted Simon and helped it to defraud Plaintiff and all of the Classes by obtaining money through a series of fraudulent misrepresentations and acts.  The association was structured by contracts between and among the participants.  Simon had a contract with Valquest under which Valquest agreed to provide energy surveys to Simon's tenants in exchange for payments from Simon. Valquest's so-called energy audits were nothing more than a sham used to justify the Defendants' mark-up of electrical charges and to help hide their illegal conduct from Plaintiff and the Classes.

60.     Accordingly, Simon, Simon Partnership, M.S. Management, The Trust, and Valquest, along with other unnamed co-conspirators were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) sending and receiving thousands of lease agreements that contained representations that limited the electric charges to tenants to the amount charged by the local electrical utility that the Defendants intended to and did violate; (2) sending tens of thousands of invoices to tenants on a monthly basis through the U.S. mail that falsely represented a charge for energy that was in fact inflated; (3) receiving tens of thousands of the inflated energy payments from the tenants on a monthly basis by interstate wire

and through the U.S. mail; and (4) sending fraudulent energy audits by interstate wire and through the U.S. mail.

61.     Simon and its co-conspirators profited handsomely from the enterprise and Plaintiff and the members of all of the Classes suffered because the enterprise significantly increased the amounts paid for electricity by Plaintiff and the Classes.  While the majority of those overpayments on electricity were received by Simon, smaller amounts of the profits from the marked-up electrical charges were retained by The Trust, the other single purpose entities created to own the shopping malls, Simon Partnership, and M.S. Management, and some were paid to Valquest.

62.     At all relevant times, Simon, Simon Partnership, M.S. Management, Valquest, and The Trust, along with other unidentified co-conspirators were associated-in-fact for the common purpose of engaging in the Defendants' profit-making scheme.

63.     The members of the RICO enterprise all share a common purpose: to enrich themselves at all of the members of the Classes expense by maximizing the revenues of Simon, Simon Partnership, M.S. Management, The Trust, the other single purpose entities Simon created to own its shopping malls, and Valquest, through fraudulently inducing Plaintiff and the Classes to pay more for electricity than represented to them in the lease agreements through a scheme that used inflated energy audits to help justify the marked up electric charges.  The Defendants increased their profits and Valquest benefitted because it was compensated by Simon for providing the inflated energy audits to Plaintiff and the members of the Classes.   The Defendants and Valquest shared the bounty of their criminal enterprise, *i.e.,* by sharing the overpayments for electrical charges generated by the joint scheme to defraud the Plaintiff and the Class members.

64.     Each participant in the RICO enterprise had systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of

activities.  The RICO enterprise and the Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purpose of increasing their revenues and profits.  The Defendants participated in the operation and management of the RICO enterprise by directing its affairs as described herein.  While the Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, reporting requirements, and financial statements.

65.     This RICO enterprise has existed for years and continues to exist and operates pursuant to certain agreements entered into between and among Simon, Simon Partnership, M.S. Management, The Trust, Valquest, and other unnamed co-conspirators.  The RICO enterprise has functioned as a continuing unit and has and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

66.     The Defendants conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Plaintiff has attached a standard form lease agreement (Ex. A), a monthly invoice (Ex. B), and a charge backup report (Ex. C) representing the continuity of the Defendants' conduct over time and on a monthly basis, representing separate and distinct instances of mail and wire fraud. Thus, Plaintiff has demonstrated the continuity of the Defendants' conduct over a fixed period of time.  Furthermore, the Defendants continue to engage in these predicate acts and to harm the Class members on a daily basis, which establishes a threat of long-term racketeering activity and

evidences the continuity of Simon's and the other Defendants' open-ended pattern of racketeering activity.

67.     Simon received payment for the marked-up electric charges from Plaintiff and the members of the Classes sometimes directly and sometimes indirectly through Simon Partnership, M.S. Management, The Trust, and other unnamed co-conspirators through the United States Postal Service and interstate wire facilities in violation of 18 U.S.C. §§ 1341 and 1343.  In furtherance of the scheme, Simon, sometimes directly and sometimes indirectly through M.S. Management, Simon Partnership, The Trust, and other unnamed co-conspirators committed thousands of separate mail and wire fraud violations on a monthly basis for years through the transmission of its standard form lease agreements, monthly invoices, and energy surveys, each one constituting its own separate and distinct predicate act.  Each of these violations was related because they shared the common purpose of defrauding Plaintiff and the Classes by overcharging them for electricity in direct contravention of the express representations of the lease agreement.  Simon also transferred between and among, and received sums from, Plaintiff and the Classes, Valquest, Simon Partnership, M.S. Management, The Trust, and other unnamed co-conspirators, including but not limited to the payments of the marked-up electricity costs, in furtherance of its scheme to defraud Plaintiff and Class members in violation of 18 U.S.C. § 1343.

68.     These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

69.     Simon and the other Defendants had the specific intent to participate in the overall RICO enterprise, which is evidenced by its scheme to defraud Plaintiff and the Classes. Simon's scheme was reasonably calculated to deceive the Plaintiff and all of the Class members, all of

whom are of ordinary prudence and comprehension, through the execution of its complex, surreptitious, and illegal mark-up of electricity charges scheme. Plaintiff and Class members relied on the uniform misrepresentations in the standard lease agreements that the shopping malls would not charge more for electricity than if the electricity was purchased directly from the local public utility provider.  Plaintiff and the Classes relied on the uniform misrepresentations in the lease agreements and the invoices believing that they accurately reflected the actual electric costs as required under the standard lease agreements.  Plaintiff and the Classes relied on the invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

70.     Simon, Simon Partnership, M.S. Management, The Trust, Valquest, and other unnamed co-conspirators received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce.  Furthermore, Simon used and invested the income it received through its pattern of racketeering activity to operate its business, which caused Plaintiff and the Classes to suffer damages.  The investment of the marked up electricity profits obtained through Simon's deception in the standard lease agreements it caused M.S. Management and the single purpose entities it created that owned its shopping malls to use enabled Simon to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and Classes members on an ongoing basis.  In so doing, Simon and the other Defendants violated Section 1962(a).

71.     Simon and the other Defendants and Valquest conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Specifically, the lease agreements used at the shopping malls Simon owned through its holding companies contained uniform misrepresentations that the Plaintiff and the Classes would not be charged more for

electricity than if the Plaintiff and the Classes purchased that electricity directly from the local public utility provider. The invoices sent by U.S. mail to the Plaintiff and the Classes, sometimes by Simon directly and sometimes by M.S. Management, continued the deception by itemizing the cost for electricity when, in fact, that cost was inflated and represented profit to Simon. Plaintiff and the Nationwide Class, all of whom were of ordinary prudence and comprehension, relied on the uniform misrepresentations in the lease agreements and the invoices, believing that they accurately reflected the actual electric costs as required under the standard lease agreements. Further, Simon through Simon Partnership, M.S. Management, The Trust, and the single purpose entities it created to own its shopping malls, contractually barred audits which would have uncovered the scheme, instead only providing false audits produced by Valquest. Plaintiff and the Classes relied on the invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

72.     Simon, Simon Partnership, M.S. Management, The Trust, Valquest, and other unnamed co-conspirators, as noted above, conspired to violate sections 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

73.     By reason, and as a result thereof, Defendants' conduct and participation in the racketeering activity described herein has caused Plaintiff and the Classes to directly incur damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against Simon, Simon Partnership, M.S. Management, and The Trust for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT II**
**UNJUST ENRICHMENT**
**SIMON, SIMON PARTNERSHIP, AND M.S. MANAGEMENT**
**(ON BEHALF OF ALL CLASSES)**

74.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

75.     Simon, Simon Partnership, and M.S. Management received, and continue to receive, payments for electricity from all Class members in excess of what the shopping malls owned by Simon through its holding companies actually paid and pay for that electricity from the local electric utility company.  Instead of charging tenants only for what the shopping malls were charged for electricity as was promised, Simon, Simon Partnership, and M.S. Management charged Plaintiff and the Classes substantially more for that electricity, retaining the excess amount as unearned profit for themselves.  There is no contract between Plaintiff or any Class member and Simon, Simon Partnership, or M.S. Management that governs the cost of electricity.  Instead, all of those contracts are between the Class members and the single purpose entities Simon created to own its shopping malls.

76.     Plaintiff and the Class members directly conferred a benefit on Simon, Simon Partnership, and M.S. Management in the form of the money they paid for the marked-up electrical charges.  Simon, Simon Partnership, and M.S. Management knowingly and wrongfully accepted and retained that marked-up amount of the electricity costs for their own benefit.  Accordingly, Simon, Simon Partnership, and M.S. Management received benefits, in the form of the profits derived from marking up Plaintiff and all of the Class' members energy charges, that they unjustly retained at the expense of Plaintiff and all of the Class members.

77.     The circumstances are such that it would be inequitable to allow Simon, Simon Partnership, and M.S. Management to retain the payments they collected from Plaintiff and all of

the Class members that were in excess of what the shopping malls owned by Simon through its holding companies paid the local utilities for that same electricity.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against Simon, Simon Partnership, and M.S. Management for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT III**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**SIMON, SIMON PARTNERSHIP, M.S. MANAGEMENT**
**(ON BEHALF OF THE FLORIDA STATUTORY CLASS AND THE TCBR CLASS)**

78.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

79.     This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

80.     At all times material, Plaintiff and all members of the Florida Statutory Class and the TCBR Class were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA in accordance with Section 501.211, Fla. Stat.

81.     At all times material, Simon, Simon Partnership, and M.S. Management conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

82.     Simon, Simon Partnership, and M.S. Management have engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

83.     The concealment and omissions of material facts and misrepresentations and deceptions alleged in the preceding paragraphs occurred in connection with Simon, Simon Partnerships, and M.S. Management's trade and commerce in Florida.

84.     Simon's, Simon Partnership's, and M.S. Management's unfair and deceptive acts and practices violated FDUTPA, Sections 501.201 and 501.211, Fla. Stat.

85.     As a direct and proximate result of Simon, Simon Partnerships and M.S. Management's FDUTPA violations, Plaintiff, the Florida Statutory Class, and the TCBR Class have been damaged in an amount to be proven at trial.

86.     Plaintiff, the Florida Statutory Class, and the TCBR Class are entitled to actual damages, attorneys' fees and costs, and all other remedies available under FDUTPA.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against Simon, Simon Partnership, and M.S. Management for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT IV**
**VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT,**
**FLA. STAT.  §§ 772.103, 772.104(1), 777.011, AND 777.03(1)(A)**
**SIMON, SIMON PARTNERSHIP, M.S. MANAGEMENT**
**(ON BEHALF OF THE FLORIDA STATUTORY CLASS AND THE TCBR CLASS)**

87.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 and 53 through 73 of this Complaint as if fully set forth herein.

88.     As described above, Simon, Simon Partnership, M.S. Management, Valquest, and other unnamed co-conspirators, were associated in an enterprise and conspired, aided and abetted and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of Fla. Stat. §§ 772.103, 772.104(1), 777.011, and 777.03(1)(a).

89.     In furtherance of its scheme, Simon, Simon Partnership, M.S. Management, and other unnamed co-conspirators engaged in thousands of acts of mail and wire fraud for more than fifteen years in violation of federal law, as set forth above, and Fla. Stat. § 817.034.

90.     Simon, Simon Partnership, M.S. Management, Valquest, and other unnamed co-conspirators engaged in a pattern of racketeering activity and engaged in more than two incidents of racketeering or racketeering conduct that has the same or similar intents, results, accomplices, victims, or methods of commission, and that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

91.     Plaintiff has attached a standard lease agreement (Ex. A), a monthly invoice (Ex. B), and a charge backup report (Ex. C), that represent the continuity of Defendants' conduct over time and on a monthly basis and are separate and distinct examples of mail and wire fraud violations. Thus, Plaintiff has demonstrated the continuity of the Defendants' conduct over a fixed period of time.  Furthermore, Simon, Simon Partnership, M.S. Management and Valquest continue to engage in these predicate acts and harm Florida Statutory Class members and the TCBR Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of Simon, Simon Partnerships, and M.S. Management's open-ended pattern of racketeering activity.

92.     Simon, Simon Partnership, and M.S. Management used and invested the income they received through their pattern of racketeering activity to operate their business which caused Plaintiff, the Florida Statutory Class members, and the TCBR Class members to suffer direct damages.  The investment of the marked-up energy costs obtained by Simon, Simon Partnership, and M.S. Management through their illegal conduct of marking up the tenants' electrical charges enabled Simon, Simon Partnership, and M.S. Management to perpetuate the operation of the

enterprise and to continue to defraud Plaintiff, the Florida Statutory Class members, and the TCBR Class members.

93.     By reason, and as a result thereof, Simon, Simon Partnership, and M.S. Management's conduct and participation in the racketeering activity described herein directly caused Plaintiff and the Florida Statutory Class members to incur significant and substantial damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against Simon, Simon Partnership, and M.S. Management for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT V**
**BREACH OF CONTRACT**
**THE TRUST**
**(ON BEHALF OF THE TCBR CLASS)**

94.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

95.     The Trust entered into lease agreements with Plaintiff and the TCBR Class members for the use of the premises located at TCBR, for the purpose of retail sales and related services.

96.     In Plaintiff and the TCBR Class members' lease agreements, The Trust stated with respect to electrical charges that the "Landlord may make electrical service available to the Premises . . . at the same cost as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises . . . ." Accordingly, The Trust promised Plaintiff and the TCBR Class members that it would not mark-up their electrical costs and that Plaintiff and

the TCBR Class members would be charged the same amount by The Trust for electricity as if they had purchased that electricity directly from the local public utility provider.

97.     The Trust, at the direction of Simon, also put in the lease agreements provided to Plaintiff and the TCBR Class members a provision that the TCBR Class members waived their audit rights to review The Trust's electric bills.  Simon directed The Trust to insert this provision to insulate its illegal conduct from the scrutiny of Plaintiff and the TCBR Class members.

98.     The Trust breached the lease agreements with Plaintiff and the TCBR Class members by marking up their electrical costs and charging them more for electricity than The Trust actually paid the local electric utility for that same electricity.

99.     By marking up Plaintiff's and the TCBR Class members' electrical costs and charging them amounts in excess of what The Trust actually paid the electric utility for that same electricity, The Trust breached its lease agreements with Plaintiff and the TCBR Class members, resulting in damages to Plaintiff and the TCBR Class members.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against The Trust for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT VI**
**BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**
**THE TRUST**
**(ON BEHALF OF THE TCBR CLASS)**

100.     Plaintiff re-alleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

101.    The implied covenant of good faith and fair dealing applies to every contract and relates to an express term of a contract.

102.    The purpose of the implied duty of good faith is to protect the parties' reasonable commercial expectations.  The question arises when one party has a discretionary decision without defined standards.

103.    The Trust entered into lease agreements with Plaintiff and the members of the TCBR Class for the use of premises owned by The Trust for the purpose of retail sales and related services.

104.    In Plaintiff and the TCBR Class members' lease agreements with respect to electric charges, The Trust expressly agreed that "Landlord may make electrical service available to the Premises . . . at the same cost as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises . . . " Accordingly, The Trust promised Plaintiff and the TCBR Class members that it would not mark-up their electric costs and that Plaintiff and the TCBR Class would be charged by The Trust the same amount for electricity as if they were purchasing that electricity directly from the local electric utility.  The Trust had an implied duty of good faith to charge the appropriate amount.

105.    The Trust also put in the lease agreements provided to Plaintiff and the TCBR Class members a provision that the TCBR Class members waived their audit rights to review The Trust's electric bills.  The Trust inserted this provision to insulate its illegal conduct from the scrutiny of Plaintiff and the TCBR Class members

106.    By charging Plaintiff and the TCBR Class amounts greater than what The Trust actually paid for the electricity, The Trust breached the implied covenant of good faith and fair

dealing attached to the terms of the contract.  Accordingly, Plaintiff and the TCBR Class members suffered damages.

WHEREFORE, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against The Trust for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

A.      Certify this action as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3); appoint Plaintiff the representative of the Nationwide Class, the Florida Statutory Class, and the TCBR Class; and appoint Buckner + Miles and Kelley Uustal as Class Counsel.

B.      Award Plaintiff and the Class all common law, compensatory, and special damages as well as restitution and statutory remedies for Simon, Simon Partnership, and M.S. Management and The Trust's violations of law and breaches of contract, including pre- and post-judgment interest on these amounts.

C.      Award Plaintiff and the Class treble damages.

D.      Award Plaintiff and the Class their attorney's fees, costs, and expenses.

E.      Award Plaintiff and the Class such further relief as is appropriate in the interests of justice.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by law.

DATED:  May 19, 2020                    Respectfully submitted,

                                        **BUCKNER + MILES**

                                        By /s/ Seth Miles
                                        Seth Miles, Esq., FBN 385530
                                        David M. Buckner, Esq., FBN 60550
                                        Brett E. von Borke, Esq., FBN 0044802
                                        3350 Mary Street
                                        Coconut Grove, Florida 33133
                                        Telephone: 305.964.8003
                                        E-mail: david@bucknermiles.com
                                        E-mail: seth@bucknermiles.com
                                        E-mail: vonborke@bucknermiles.com

                                        Michael A. Hersh, Esq., FBN 56019
                                        Catherine Darlson, Esq., FBN 112440
                                        Kelley Uustal
                                        500 N. Federal Highway, Suite 200
                                        Fort Lauderdale, Florida 33301-1103
                                        Telephone: 954-522-6601
                                        E-mail: mah@kulaw.com
                                        E-mail: ccd@kulaw.com

                                        *Counsel for Plaintiff and the Proposed Class*