IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| CAFÉ, GELATO & PANINI LLC, d/b/a/ CAFÉ GELATO PANINI, and DJAMES FOODS, INC., d/b/a/ PETE'S BURGERS, WINGS & DRINKS on behalf of themselves and all others similarly situated, | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| | : : | Civil Action No. 0:20-cv-60981-RKA |
| v. | : : | |
| SIMON PROPERTY GROUP, INC., SIMON PROPERTY GROUP, L.P., M.S. MANAGEMENT ASSOCIATES, INC., and THE TOWN CENTER AT BOCA RATON TRUST, | : : : : : : : : | |
| Defendants. | : : | |

**DEFENDANTS' MOTION TO ABSTAIN OR ALTERNATIVELY TO DISMISS
AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendants Simon Property Group, Inc. ("Simon Property"), Simon Property Group, L.P. ("Simon Partnership"), M.S. Management Associates, Inc. ("M.S. Management"), and The Town Center at Boca Raton Trust (the "Trust") (collectively, "Simon" or "Defendants"), by their undersigned counsel, file this Motion to Abstain or alternatively to Dismiss Plaintiffs' Amended Complaint with incorporated Memorandum of Law (the "Motion").

## I.    STATEMENT OF FACTS[1]

Plaintiff Café Gelato & Panini LLC ("Gelato") was a commercial tenant at The Town Center at Boca Raton in Florida ("TCBR")—a retail shopping mall with over 200 different stores

---

[1] For the purposes of the Motion to Dismiss, Plaintiffs' well-pleaded factual averments are assumed to be true, except to the extent that they are inconsistent with Plaintiffs' exhibits but are not admitted by Simon.

and eateries.  (Am. Compl. ¶¶ 6, 21.)  TCBR is owned by the Trust.  (*Id.* ¶ 6.)  Gelato and the Trust entered into a 5-year lease agreement for retail space at TCBR on October 24, 2014 (the "Gelato Lease").  (Ex. 1 to Am. Compl. (Gelato Lease).)[2]  The premises were to be used and operated as a business in the retail sale of Italian gelato, non-alcoholic beverages, and bakery products.  (Am. Compl. ¶ 23.)  Gelato and the Trust agreed on terms for Minimum Annual Rent, increased periodically throughout the contemplated lease term.  (Gelato Lease, § 1.1(g).) [3]

A new plaintiff was added in the Amended Complaint.  Djames Foods, Inc. d/b/a Pete's Burgers, Wings & Drinks ("Pete's Burgers") is currently a commercial tenant at the Firewheel Town Center ("Firewheel")—an outdoor shopping, dining and entertainment destination located in Texas, which "Simon [Property] owns through its wholly owned subsidiary Simon Property Group (Texas), L.P." ("Simon Texas").[4]  (Am. Compl. ¶ 7.)  Pete's Burgers and Simon Texas entered into a 10-year lease agreement for retail space at Firewheel in September 2017.  (Ex. 2 to Am. Compl. ("Pete's Burgers Lease," together with the Gelato Lease, the "Leases").  The leased premises at Pete's Burgers were to be used as a sit-down restaurant "serving primarily pizza, burgers, wings, and beverages."  (Am. Compl. ¶ 56.)  As with the Gelato Lease, Pete's Burgers and Simon Texas agreed on terms for Minimum Annual Rent, increased periodically throughout the contemplated lease term.  (Pete's Burgers Lease, § 1.1(g).)

Both Gelato and Pete's Burgers, agreed in their respective Leases that "[a]ll amounts required or provided to be paid by Tenant under this Lease other than Minimum Annual Rent and

---

[2] As Gelato alleges, it first took possession of the premises in 2010.  (Compl. ¶ 18.)  The Lease was a renewal.  The determination of consumption of electricity was made in 2011 and was never increased after that time.

[3] Gelato abandoned the premises in violation of the Lease on February 5, 2017, owing the Trust $22,465.00 in arrears and an additional $327,955.43 in rent for the duration of the Lease.

[4] Simon Texas is not named as a Defendant in this suit.

Percentage Rent shall be deemed additional rent and Minimum Annual Rent, Percentage Rent and additional rent shall in all events be deemed rent."  (The Leases, § 4.6.)   As a component of additional rent, they also agreed to purchase and pay for electrical services for their leased premises.  (*Id.* § 7.1.)  The amount Plaintiffs were required to pay as additional rent for electrical services was based upon Landlord's determination from time to time of Tenant's consumption of electricity and charged at "the same cost as would be charged to *Tenant from time to time by the utility company* [and/or alternate provider as designated by Landlord[5]] which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises, *but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service*."  (*Id.,* emphasis supplied.)

There are significant differences between the two plaintiffs regarding how they were charged for electricity.  The Trust determined Gelato's electricity consumption, which was not separately metered, by using a detailed "energy survey" which was conducted by a third party, Valquest Systems, Inc. ("Valquest").  (Am. Compl. ¶ 34.)  Simon Texas determined Pete's Burgers' ongoing electricity consumption through a dedicated sub-meter; contrary to Plaintiffs' allegations, there was no need for any survey or consumption estimate from Valquest.  (*See* Ex. 8 to Am. Compl. (Pete's Burger Charge Backup Report) at "Load Basis" Column, indicating ("Metered").)

Gelato and Pete's Burgers allege that they received monthly invoices through the U.S. Mail with line items for electricity.  (*Id*. ¶¶ 28, 61; *see also* Ex. 4 to Am. Compl. (Gelato Invoice); Ex. 7 to Am. Compl. (Pete's Burgers Invoice).)  The Leases provided that Gelato and Pete's Burgers

---

[5] Bracketed language appears only the Pete's Burger Lease and does not appear in the Gelato Lease.

were free to object to any statement, invoice, or billing rendered by the Landlord (the Trust and Simon Texas), so long as it was within a 30-day period. (*See* Leases, § 24.10 ("Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute Tenant's acquiescence with respect thereto.").) Neither Gelato nor Pete's Burgers ever objected to any statement or invoice relating to electricity charges within those time frames.

## II.   LEGAL ARGUMENT

### 1.   <u>THE COURT SHOULD ABSTAIN OR STAY THIS ACTION.</u>

The law is clear and well-settled that where, as here, an abstention motion is brought as an alternative to a motion to dismiss, the Court should first consider the abstention motion and if the Court decides to abstain not adjudicate the Rule 12 motion to dismiss. *See, e.g., Stone v. Wall*, 135 F.3d 1438, 1441 no. 3 (11th Cir. 1998) ("If a court states that abstention is appropriate in a case, it should not then adjudicate the case on its merits by granting a Rule 12(b)(6) motion. The order of dismissal here defeats the purpose of the abstention doctrine, which is to abstain from reaching the merits of certain claims; *O'Hair v. White,* 675 F.2d 680, 692-93 (5th Cir. 1982); *Barrett v. Atlantic Richfield Co.*, 444 F.2d 38, 40 (5th Cir. 1971)"). For the reasons set forth herein, the Court should abstain or, in the alternative, stay this action, pursuant to the *Burford* abstention or primary jurisdiction doctrines and defer to the Florida Public Service Commission ("PSC") and/or the Public Utility Commission of Texas ("PUCT")—both of which have exclusive jurisdiction here—to resolve the issue of whether Defendants complied with these regulations.

### (i)   <u>Allegations of Violation of Fla. Admin. R. 25-6.049(9)(b).</u>

With respect to Florida electricity regulations, Plaintiffs allege in the Amended Complaint all Defendants "knowingly violated Florida law when they re-sold electricity to Café Gelato and

their other Florida tenants", and  they specifically violated Fla. Admin. R. 25-6.049(9)(b), which states that "[a]ny fees or charges collected by a customer of record for electricity billed to the customer's account by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity." (Am. Compl. ¶ 49.)  Moreover, Plaintiffs cite to documents from Florida Power & Light Company ("FPL")—a Florida-based, regulated electric utility company—and allege that, according to that utility, "[r]esale of electric service [is] prohibited."  (*Id.* ¶ 50.)  Likewise, Plaintiffs cite and reference a tenant Charge Backup Report showing FPL as the utility provider, and detailing information such as kilowatt and kilowatt hours, load basis, and fuel factors.  (Ex. 5 to Am. Compl.)  Plaintiffs also add a number of allegations attributing wrongdoing relating to the figures shown in that report.  (Am. Compl. ¶¶ 39-45.)

### (ii)     Allegations of Violation of 16 TAC § 25.107(a)(1).

With respect to Texas electricity regulations, Plaintiffs likewise assert  "Simon, Simon Partnership, M.S. Management, and [nonparty] Simon Property Group Texas knowingly violated Texas law when it [sic] re-sold electricity to Pete's Burgers."  (*Id.* ¶ 77.)  Plaintiffs allege "[i]n order to re-sell electricity in Texas, Simon was required to comply with 16 TAC 25, *et. seq.* Specifically, 16 Texas Administrative Code ("TAC") §25.107(a)(1) requires that in order to re-sell electricity, Simon must, among other things, 'obtain a certificate pursuant to this subsection before purchasing, taking title to, or reselling electricity in order to provide retail electric service.'" (*Id.*)  Plaintiffs claim "Simon violated subsection a(1) of 16 TAC §25.107, among others, by re-selling electricity to Pete's Burgers, the other tenants at Firewheel, and its other tenants in Texas because it was not licensed to do so."  Plaintiffs claim electricity for Pete's Burgers was provided by the "City of Garland Utility Services."  (*Id.*  ¶ 67.)  Plaintiffs cite to a Charge Backup Report

showing City of Garland Utility Services as the utility provider, and detailing a current meter reading, kilowatts and kilowatt hours, load basis, and fuel factors.  (Ex. 8 to Am. Compl.)  As with Café Gelato, Plaintiffs also attribute wrongful conduct and "misrepresentations" regarding the various rates and charges on that report.  (Am. Compl. ¶¶ 68-73.)

### (iii)    The PSC Has Exclusive Jurisdiction to Determine Alleged Overcharging Issues Under Fla. Admin. R. 25-6.049.

The Trust's ability to master meter and bill tenants like Café Gelato for electric service exists solely because of Florida Administrative Code Rule 25-6.049, Measuring Customer Service, which has been promulgated by the PSC.

Under Florida law, "supplying electricity . . . to or for the public within the state" is reserved to the electric companies as are defined in Section 366.02, Florida Statutes—and regulated by the PSC pursuant to Section 366.04, Florida Statutes.  A fundamental PSC regulation requires that each utility customer must be directly metered for electric service by the serving electric utility.  *See* Fla. Admin. Code R. 25-6.049(1).  However, the PSC has recognized there are certain situations in which it is impractical or inefficient for the serving utility to directly supply and meter each end user of electricity.  The Trust's ability to provide electric service to its tenants through master metering exists solely because of the PSC's master metering rule for pre-1981 construction permits.  Rule 25-6.049(5) grandfathers any occupancy units for which a construction permit was issued before January 1, 1981 and for which master-metered service has been continuously provided since January 1, 1981.  Along with the creation of this exception, the PSC has also promulgated ongoing operational requirements with which each such master-metered entity must comply.  In Rule 25-6.049(9), the PSC requires each master-metered entity use

"reasonable apportionment methods" that shall reimburse the landlord "for no more than the customer's actual cost of electricity."

The Florida Legislature granted the PSC "exclusive and superior" jurisdiction over the supplying of electricity. *See* Fla. Stat. §§ 366.02(1), 366.04(1). Inherent in this grant of exclusive jurisdiction is the power to determine whether a commercial landlord supplying electricity to its tenant pursuant to Rule 25-6.049. The Florida Supreme Court has consistently and repeatedly required the state courts to immediately terminate their proceedings and give way to the PSC, even where there is only a colorable claim of PSC jurisdiction. *See, e.g.*, *Public Service Comm'n v. Fuller*, 551 So. 2d 1210 (Fla. 1989) (holding where the PSC has exclusive jurisdiction, a court is without jurisdiction to conduct proceedings); *see also Florida Educ. Ass'n v. Wojcicki*, 930 So. 2d 812 (Fla. 3d DCA 2006) (where statute vested exclusive jurisdiction in administrative agency, court lacked jurisdiction to hear case).

The PSC's exclusive jurisdiction to address allegations of overcharges or incorrect billings extends beyond regulated utilities to include commercial landlords with master billing of their tenants, such as Simon here. The leading case is *Florida Public Service Comm'n v. Bryson*, 569 So. 2d 1253 (Fla. 1990). In *Bryson*, the Florida Supreme Court held a court had no jurisdiction to proceed in a matter involving allegations that a management company overcharged a condominium unit owner for electricity. Judge Bryson was directed to dismiss the judicial proceedings so the PSC could address the billing issues—which the PSC did.[6] See also *Roemmele-Putney v. Reynolds*, 106 So. 3d 78, 80-81 (Fla. 3d DCA 2013) (citing Fla. Stat. § 366.04(1). The result has been the same for class actions claiming misbilling and overcharges and claims under

---

[6] *See* Fla. PSC Docket No. 19910056, Order No. 25234 (October 18, 1991), *aff'd*, *Faulk v. Beard*, 614 So. 2d 1086 (Fla. 1993).

the Florida Deceptive and Unfair Trade Practices Act, where a claimant "is seeking a refund of a portion of the rate charged and collected." *Florida Power & Light Co. v. Albert Litter Studios, Inc.*, 896 So. 2d 891 (Fla. 3d DCA 2005); *Extraordinary Title Servs. LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 403 (Fla. 3d DCA  2009).

The PSC routinely addresses whether master metered sites are acting in compliance with its rules.  *See* Fla. PSC Docket No. 20190094-EU, Order No. PSC-2019-0357-PAA-EU, Notice of Proposed Agency Action Order Granting Rule Waiver Subject to Conditions (August 23, 2019), consummated by Order No. PSC-2019-0377-CO-EU (Sept. 16, 2019).[7]  As the PSC cases establish, there are different ways of demonstrating compliance with the "bill not more than" language of the PSC rule, and the PSC, as the creator and enforcer of that rule, is the best arbitrator of whether Simon complied with that rule.

With respect to those claims that on their face may seem to involve matters outside of the PSC's jurisdiction—such as contract disputes, damages, and lost profits—case law establishes that in those instances the court should stay the case and refer the matter to the PSC to resolve those matters within its exclusive jurisdiction, with any remaining issues addressed by the court *after* the PSC resolves those matters within its exclusive jurisdiction.  For example, in *Home Shopping Network*, the circuit court stayed its proceedings and referred specific questions to the PSC to answer. *See* Fla. PSC Docket No. 19980815, Order No. 20980, Denying Motion to Dismiss (Apr. 4, 1989), and Order No. 21280, Final Order on Referral (May 25, 1998).  There was a similar result in the Dade County Circuit Court referral in *TSI v. Transcall*. *See* Fla. PSC Docket No. 19951232, Final Order on Issues Referred to the Commission by the Dade County Circuit Court, Order No.

---

[7] While this docket involved a condominium seeking a waiver, the requirements of Rule 25-6.049(9) apply uniformly to condominiums and Defendant's shopping malls.

PSC-1998-1556 (Nov. 23, 1998) (PSC used its Staff Auditors to assess the scope of the TSI claims and, on the basis of their audit report, the Final Order actually found the circuit court plaintiff owed Transcall, and not the other way around).  Finally, in *Dohan*, a class action, the circuit court stayed the case and referred the issue of alleged overcharges to the PSC before the case ultimately settled. *See* Fla. PSC Docket No. 19951270, Final Order Acknowledging Settlement Agreement, PSC-1997-0726 (June 20, 1997).

By expressly alleging Defendants "knowingly violated Florida law when they re-sold electricity to Café Gelato and their other Florida tenants" and they specifically violated Fla. Admin. Code R. 25-6.049(9)(b), Plaintiffs squarely placed in issue whether Defendants complied with an administrative regulation promulgated and administered by the PSC as part of Florida's comprehensive scheme of regulating the sale of electricity. Further, because Plaintiffs invoke the FPL tariff (*see* Am. Compl. ¶ 50 & Ex. 6), which exists solely pursuant to the PSC's exclusive regulatory authority, the PSC is in the best position to know which of the hundreds of tariffed rate elements would have applied to Plaintiffs if directly billed by FPL.

### (iv)     The PUCT Has Exclusive Jurisdiction to Determine the Alleged Utility Issues Under Texas Law.

Plaintiffs allege Defendants violated Texas law under 16 TAC § 25.107(a)(1) by reselling electricity to Pete's Burgers without certification as a Retail Electric Provider ("REP").  Under 16 TAC § 25.107, a person must obtain  a REP certificate from the PUCT before providing electric service to retail customers in an area where customer choice is in effect.  The PUCT promulgated 16 TAC § 25.107 pursuant to PURA § 39.352(a), which requires the PUCT to grant REP certificates to applicants who demonstrate sufficient qualifications to provide retail electric service; § 39.356, which grants the PUCT authority to establish terms under which the commission

may suspend or revoke a REP's certification; and § 39.357, which grants the PUCT authority to impose an administrative penalty for violations of § 39.356. Moreover, the PUCT has the authority under PURA § 15.023 to impose administrative penalties for violations of its rules. Thus, the PUCT is the agency vested with the sole authority to determine whether Simon violates the PUCT's rule, 16 TAC § 25.107. Plaintiffs' allegations of a violation of 16 TAC § 25.107 relating to REP certification create legal and factual questions only the PUCT can answer as the expert agency created by the Texas Legislature.

This Court should abstain from considering claims arising under Texas law until administrative remedies before the PUCT have been determined; with respect to federal claims, this Court should defer to the primary jurisdiction of the PUCT. [8]

1.    **The Determination of Whether Simon Is in Violation of PURA § 39.105(b) and Whether Simon's Provision of Electricity Falls Within the Self-Use Exception Is Within PUCT's Exclusive Jurisdiction.**

The actual regulatory issues alleged by the Amended Complaint—relating to GP&L's exclusive right to sell electric service at retail within its certificated service area fall within the exclusive jurisdiction of the PUCT. The Court should abstain from determining Plaintiffs' state law claims and should dismiss or stay Plaintiffs' federal claims under the doctrine of primary

---

[8] Even if Simon were a REP, the PUCT would still have exclusive jurisdiction because the Texas PUC has the sole authority to certify and regulate REPs and because PURA establishes a pervasive regulatory scheme governing retail customer protection standards and customer billing disputes. *See PURA § 17.001(b) (stating "The purpose of this chapter is to establish retail customer protection standards and confer on the [PUCT] authority to adopt and enforce rules to protect retail customers from fraudulent, unfair, misleading, deceptive, or anticompetitive practices."); see also PURA § 17.157(a) ("The [PUCT] may resolve disputes between a retail customer and a billing utility, service provider,…retail electric provider, or electric utility."); see also, e.g., Isa v. CenterPoint Energy Houston Elec., LLC*, No. 03-17-00742-CV, 2018 WL 4100790 at 3 (Tex. Ct. App. Aug. 29, 2018). ("Chapter 17 of PURA sets out a pervasive, comprehensive statutory scheme governing the resolution of disputes between customers and their utilities and REPs." (emphasis added)). And even if the PUC had only primary jurisdiction, this Court should still abstain and dismiss or stay the action because (1) the PUC is "staffed with experts trained in handling the complex problems in the agency's purview" and (2) great benefit is derived from the PUC "uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002).

jurisdiction.

PURA § 31.002(6) defines "electric utility" as a person that owns or operates for compensation facilities to sell or furnish electricity. However, PURA created a self-use exception to the definition of "electric utility," excepting any person who "furnishes an electric service or commodity only to itself, its employees, *or its tenants as an incident of employment or tenancy*, if that service or commodity is not resold to or used by others." PURA § 31.002(6)(J)(i) (emphasis added). As set forth below, the determination of whether Simon violates PURA § 39.105(b), by providing electric service within the exclusive service area of an MOU, GP&L, and whether Simon's actions fall within the self-use exception of § 32.001(6)(J)(i), by providing electric service as an incident of tenancy, is within the exclusive jurisdiction of the PUCT.

A federal court determining state law claims must analyze whether a state agency has exclusive jurisdiction over the claims and, if it concludes that a state court would not exercise subject matter jurisdiction due to the state agency's exclusive jurisdiction, the district court should decline to exercise jurisdiction. *See Autobahn Imports, L.P. v. Jaguar Land Rover North Am., L.L.C.*, 730 F. App'x 184 (5th Cir. 2018) (affirming district court's dismissal of claims based on exclusive jurisdiction of Texas agency); *see also Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 716 (N.D. Tex. 2011). With respect to federal claims, where a regulatory scheme provides for the exclusive jurisdiction of an agency with subject matter expertise, a federal court will defer to that jurisdiction under the doctrine of primary jurisdiction, as explained below; and even where state agency jurisdiction is not exclusive, district courts will nevertheless defer to state agency jurisdiction under the primary jurisdiction doctrine when the matter falls within the special competence of the agency. *See Penny v. Southwestern Bell Tel. Co.*, 906 F.2d 183, 187-89 (5th Cir. 1990) (concluding PUCT lacked exclusive jurisdiction in case involving issue of whether

telephone company charged customers discriminatory rates but deferring to PUCT under primary jurisdiction doctrine).

In *Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212 (Tex. 2002), the Texas Supreme Court explained an agency's exclusive jurisdiction arises when the Legislature grants that agency the sole authority to make an initial determination in a dispute.  84 S.W.3d at 221.  Courts will find such exclusive jurisdiction if a statute includes clear language expressing the Legislature's intent that the agency have exclusive jurisdiction over the matters that the statute governs, *id.* at 222, or "when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *In re Southwestern. Bell Tel. Co.*, 235 S.W.3d 619, 624-25 (Tex. 2007) (citing *David McDavid Nissan*, 84 S.W.3d at 221.  In two pivotal cases, the Texas Supreme Court held that PURA creates a "pervasive regulatory scheme" for regulating electric utilities in Texas. *See Entergy*, 142 S.W.3d at 322-23; *Oncor Electric Delivery Co. LLC v. Chaparral Energy, LLC*, 546 S.W.3d 133, 141 (Tex. 2018) ; *see also Isa v. CenterPoint Energy Houston Elec., LLC*, No. 03-17-00742-CV, 2018 WL 4100790, at *4 (Tex. Ct. App. Aug. 29, 2018).

PURA § 32.001(a) explicitly grants the PUCT exclusive jurisdiction "over the rates, operations, and services of an electric utility in: (1) areas outside a municipality; and (2) areas inside a municipality that surrenders its jurisdiction to the [PUCT]."  However, the present dispute is outside the scope of this specific grant because the area at issue is within the municipal boundaries of Garland and, to date, Garland has not surrendered jurisdiction to the PUCT. Furthermore, PURA § 32.001(a) does not address the overarching question at issue: whether, in the first instance, Simon meets the statutory definition of an electric utility.  Because no statute in PURA specifically grants the PUCT exclusive jurisdiction to determine whether an entity is an

electric utility, an analysis under the "pervasive regulatory scheme" test is appropriate.  The Court in *Entergy* held that the statutory language is determinative in such an analysis.  142 S.W.3d at 322-23.

PURA § 14.001 grants the PUCT broad authority "to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by [PURA] that is necessary and convenient to the exercise of that power and jurisdiction." Electric utilities are included within the definition of public utility by PURA § 11.004(1).  To regulate and supervise electric utilities, the PUCT must have authority to determine the threshold question of whether an entity is an electric utility.  Indeed, PURA "shall be construed liberally to promote the effectiveness and efficiency of regulation of public utilities." PURA § 11.008.

Furthermore, Subchapter A of PURA Chapter 31—the same subchapter of PURA that defines "electric utility" and that includes the self-use exception—begins by stating the subchapter's purpose in broad terms: "to *establish a comprehensive and adequate regulatory system for electric utilities* to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." PURA § 31.001(a) (emphasis added).  The court in *Entergy* acknowledged that "the statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas.  That is, PURA is intended to serve as a 'pervasive regulatory scheme.'"  142 S.W.3d at 323.

Although PURA creates a pervasive regulatory scheme for electric utilities, "[a]ll regulatory schemes have limitations," and the claim at issue must fit within the scope of the exclusive jurisdiction. *Chaparral*, 546 S.W.3d at 139.  For example, in *Chaparral*, the appellee attempted to distinguish the *Entergy* court's finding of exclusive jurisdiction by arguing that the

dispute in *Entergy* involved a traditional rate case to review rates fixed by the regulatory authority, while the dispute in *Chaparral* was "simply for monetary damages resulting from the breach of a private contract that has never taken on 'an administrative character.'" *Id.* The court disagreed with the appellee's attempted distinction and held that although the contract at issue did not involve the electric utility's rates, the contract was for the utility's services. Thus, under PURA's broad definition of "service," the breach of contract claim came within the PUCT's exclusive jurisdiction over such services. *Id.* at 139-40.

Similar to the facts in *Chaparral*, this case involves a contract dispute in which Plaintiffs seek monetary damages based on the assertion that Simon unlawfully provided electric service without complying with the PUCT's rules. Although the PUCT does not have the authority to grant Plaintiffs the monetary damages they seek, Plaintiffs must first address available administrative remedies before the PUCT to allow the regulatory authority to determine under the pervasive regulatory scheme whether Simon was unlawfully providing service as an electric utility in GP&L's service area. Plaintiffs must be required to seek administrative relief before the PUCT to accord that agency the respect that Texas' regulatory scheme requires. Until then, this Court must dismiss or stay Plaintiffs' claims.

### (v)     The Court Should Abstain Under the *Burford* Abstention Doctrine.

In recognition of the complex regulatory questions triggered by the Amended Complaint, and the PSC and PUCT's exclusive jurisdiction, this Court should abstain under the doctrine set forth in *Burford v. Sun Oil*, 319 U.S. 315 (1943). The *Burford* abstention doctrine "protect[s] complex state administrative processes from undue federal influence." *Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000). Under this doctrine, federal district courts will dismiss or stay civil

actions and defer to state administrative agencies "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Silvey v. City of Lookout Mountain, Georgia*, No. 4:18-CV-0027-HLM, 2018 WL 8619795, at *2 (N.D. Ga. Apr. 30, 2018) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)).

Applying the *Burford* abstention doctrine requires carefully balancing state and federal interests, and courts have considered a variety of factors in making the determination.  One set of factors that courts in this Circuit have considered is "(1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review." *Capstone Building Corporation v. American Motorists Ins. Co.*, No. 2:08-CV-0513-RDP, 2013 WL 12250149, at *2 (N.D. Ala. July 22, 2013).

The court's balancing of state and federal interests is highly fact specific.  For example, in *International Eateries of Am., Inc. v. Board of County Comm'rs of Broward County, Florida*, 838 F. Supp. 580 (S.D. Fla. 1993), a case involving challenges to local adult entertainment ordinances, the court exercised *Burford* abstention and deferred to the state on the grounds that (1) the case involved difficult questions of state law, (2) timely and adequate state court review was available, and (3) the case involved issues of particularly sensitive local concern. *Id.* at 586.

Here, the factors to be considered in applying *Burford* abstention militate in favor of abstention regarding the allegations of regulatory violations because Plaintiffs' claims flow from

whether Defendants violated the PSC or PUCT rules or improperly applied the FPL tariff to Plaintiffs' bills.  First, it is well-settled the PSC has broad and exclusive jurisdiction under state law over issues regarding the sale of electricity, which is the subject of comprehensive PSC regulation and an important issue of state concern.  In addition, the regulations on which Plaintiffs rely is not only within the exclusive jurisdiction of the PSC and the PUCT, but also are part of intricate, complex, and important state regulatory schemes.  Regulation of retail electricity sales is also a quintessential matter of local concern.[9]  And, the Florida regulatory scheme provides Plaintiffs with both a possible refund remedy with interest and effective, direct judicial review in the Florida Supreme Court.[10]

In addition, in the event the Court does not conclude that the PUCT's exclusive jurisdiction warrants dismissal, the Court should abstain with respect to the alleged Texas law violations under the *Burford* abstention doctrine.  *See, e.g.*, *Wilson v. Valley Electric Membership Corp.*, 8 F.3d 311, 312 (5th Cir. 1993) (affirming abstention under *Burford* of class action brought by customers of two rural electric cooperatives for refunds of rate increases entered without approval of

---

[9] Under federal law, the establishment of retail electric prices and any retail competition policies for customers is controlled by state-level public utility commissions, municipal electric utilities, or electric cooperatives. *See National Ass'n of Regulatory Util. Comm'rs v. Federal Energy Regulatory Comm'n*, 964 F.3d 1177, 1183 n.3 (D.C. Cir. 2020).

[10] There is no guarantee of federal jurisdiction for a RICO claim, which is subject to concurrent jurisdiction, and the balance of the Amended Complaint asserts state law claims.  The non-regulatory aspects of Plaintiffs' claims should not be separated from those implicating the PSC's jurisdiction. The non-regulatory aspects of Plaintiffs' claims are hardly "federal issues." They are primarily state law claims for breach of contract. Even the RICO claim, while alleging mail fraud as a predicate act, is grounded upon allegations of breach of contract.

Louisiana Public Service Commission while cooperatives' rates were exempt from Commission's oversight).

Here, as in *Wilson* and as described with the Florida claims above, each of the five factors supports *Burford* abstention.[11] First, Plaintiffs' RICO claim is the only federal claim; the remainder are state-law claims, and the only Texas claim is a state claim. Second, this case would cross into unsettled issues of state law (*i.e.*, does the provision of electric service by a commercial landlord to a tenant qualify as self-use as an incident of tenancy?), as well as involve local facts (Simon's billing of its Texas-based tenants). The third factor easily supports abstention because "utility regulation 'is one of the most important of the functions traditionally associated with the police power of the States.'" *New Orleans*, 491 U.S. at 365. Fourth, Texas needs a coherent policy under PURA not contradicted by federal decisions. Finally, Texas has a special state forum for judicial review of alleged violations of PURA and PUCT rules. Indeed, the PUCT "may resolve disputes between a retail customer and a billing utility, service provider, telecommunications utility, retail electric provider, or electric utility." PURA § 17.157(a). Taking all of the circumstances here into account, the Court should abstain under the *Burford* abstention doctrine.

### (vi)    The Court Should Also Abstain Based on Primary Jurisdiction.

Even if the PSC's and PUCT's lack exclusive jurisdiction, the Court should abstain under the doctrine of primary jurisdiction, which is closely related to the *Burford* abstention doctrine. "Under the primary jurisdiction doctrine, a court of competent jurisdiction may stay an action pending resolution of an issue that falls within the special competence of an administrative agency." *Beach TV Cable Co. v. Comcast of Florida/Georgia, LLC*, 808 F.3d 1284, 1288 (11th

---

[11] The five *Burford* abstention factors recognized in the Eleventh Circuit are the same as those recognized in the Fifth Circuit. *Compare Capstone*, 2013 WL 12250149, at *2, *with Aransas Project v. Shaw*, 775 F.3d 641, 649 (5th Cir. 2014).

Cir. 2015).[12]  "[T]he main justifications for the rule of primary jurisdiction are the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000) (citation omitted). Where the primary jurisdiction doctrine applies, it "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

"There is no 'fixed formula' for deciding whether an agency has primary jurisdiction over a case; instead courts consider whether 'desirable uniformity' would result from an agency determination and whether 'the expert and specialized knowledge' of the agency is needed." *City of Osceola, Ark. v. Entergy Ark., Inc.*, 791 F.3d 904, 909 (8th Cir. 2015) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).  Courts often apply the following test to determine whether the court should stay proceedings in favor of the administrative agency: whether there is "(1) [a] need to resolve an issue that (2) has been placed . . . within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008); *accord Bondhus v. Henry Schein, Inc.*, No. 14-22982-Civ, 2015 WL 1968841, at *3 (S.D. Fla. Apr. 30, 2015); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1348 (S.D. Fla. 2013).

---

[12] Although the primary jurisdiction doctrine was created by the Supreme Court in the context of referring to federal agencies, it applies equally to state agencies. *See Johnson v. Nyack Hosp.*, 964 F.2d 116, 122-23 (2d Cir. 1992); *Northwinds Abatement, Inc. v. Emp'rs Ins. of Wausau*, 69 F.3d 1304, 1311 (5th Cir. 1995).

With respect to primary jurisdiction, as with *Burford* abstention, the balancing of interests here weighs in favor of deference to the PSC and/or PUCT. The issue involves the interpretation and application of regulations promulgated and enforced by the PSC and PUCT as part of comprehensive regulatory schemes, and the issue requires the application of their expertise. Indeed, Plaintiffs' invocation of the applicable tariff further necessitates the agencies' expertise. (*See, e.g.*, Am. Compl. ¶ 50 & Ex. 6.) Courts have recognized that tariffs are "[c]omplex and technical," and that properly construing them requires a familiarity "possessed not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance." *United States v. Western Pac. R. Co*., 352 U.S. 59, 67 (1956). The FPL tariff, for example, exists pursuant to the PSC's regulations and rate-making authority under Fla. Stat. §§ 366.04, 366.041, 366.05, and 366.06. The PSC is the best and most authoritative entity to assess the applicability of the FPL tariff to Café Gelato's electric consumption and which of the multiple rate classifications and rate elements should have been billed to it. Merely looking at the tariff does not answer the billing question. Rather, "where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the [agency]." *Id.* at 66.

Accordingly, the PSC and/or PUCT must be allowed to provide the uniformity of interpretation and enforcement necessary to promote the public interest.[13]

---

[13] Notably, courts do not require that proceedings be pending at an agency to stay a case under the primary jurisdiction doctrine. Once courts have determined that the agency has primary jurisdiction, they have followed different procedures for triggering a proceeding at the agency. Sometimes, courts have directed the plaintiff to file a complaint or petition for declaratory judgment. *See, e.g., Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1379 (S.D. Fla. 2014).

2.      **THE COURT SHOULD DISMISS THIS CASE PURSUANT TO RULE 12.\**

As set forth previously, if the Court grants the Motion to Abstain, there is no need to address the balance of this Motion.  *See, Stone v. Well*, 135 F.3d 1438, 1441 No.3 (11th Cir. 1998).  In the event this Court declines to abstain, this case should be dismissed for all of the reasons that follow.

A.  **Standard of Review for Motion to Dismiss.**

When considering a motion to dismiss under Rule 12(b)(6), a court is "generally limited to the facts contained in the complaint and the attached exhibits, including documents referred to in the complaint that are central to the claim."  *McDowell v. Bracken*, 317 F. Supp. 3d 1162, 1170 (S.D. Fla. 2018).  Where an exhibit "facially negates the cause of action asserted," as is the case here, "the … exhibit controls and must be considered in determining [the Motion]."  *Fellner v. Cameron*, 2012 WL 5387696, at *4 (M.D. Fla. Oct. 5, 2012) (quoting *Fladell v. Palm Beach County Canvassing Bd.*, 772 So.2d 1240, 1242 (Fla. 2000); FED. R. CIV. P. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes").  For all of the reasons set forth hereinafter, the entire Amended Complaint should be dismissed.

B.  **All of Plaintiffs' Claims Are Barred Under the Plain Terms of the Leases.**

All of Plaintiffs' claims against all Defendants fail based on the plain language of the Leases.  Section 7.1 of the Leases state with respect to electrical service:

> Landlord [the Trust] may make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and pay Landlord for the electrical service (based upon Landlord's determination from time to time of Tenant's consumption of electricity), as additional rent … at the same cost as would be charged to Tenant from time to time by the utility company [and/or

20

> alternate provider as designated by Landlord[14]] which otherwise
> would furnish such services to the Premises if it provided such
> services and metered the same directly to the Premises, but in no
> event at a cost which is less than the cost Landlord must pay in
> providing such electrical service.

(Leases, § 7.1 (emphasis added).)

Plaintiffs misrepresent this provision repeatedly throughout the Amended Complaint by alleging that the Leases "falsely represented that the tenants at the shopping malls . . . would be charged the amount that the **shopping malls were charged** by the local utility providers to supply those tenants with electricity"— an allegation that is incorporated into all seven claims.  (Am. Compl. ¶¶ 3, 100, 123, 124-25, 136, 143, 148-50, 158.)  This is not what the Leases say.  The Leases state that (i) the Landlord determines electrical consumption and (ii) tenant *would be charged the amount that the tenant (Gelato or Pete's Burgers) would be charged by the local utility provider if it were separately metered but not less than what Landlord must pay*. The Leases do not say that the tenant would be charged the amount that the *mall* (the Trust) is charged by the utility and do not restrict the means by which Landlord may determine Tenant's consumption of electricity.[15]

There is no support for Plaintiffs' "breach" and "fraud" claims permeating the Amended Complaint.  To the contrary, the Leases expressly *permit* Plaintiffs to be billed for electrical charges in an amount equal to or greater than the Landlord's costs ("but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service") and expressly permit Landlord to determine Tenant's consumption of electricity .  (Leases, § 7.1.)

---

[14] Bracketed language appears only the Pete's Burger Lease and does not appear in the Gelato Lease.

[15] Both Leases have Entire Agreement clauses making clear that there are no representations, promises, agreements, or conditions, oral or written, between Landlord and Tenant other than set forth in the Leases.  (Leases, § 24.3.)

Plaintiffs added new allegations about seven Gelato invoices and six Pete's Burgers invoices, claiming that, for a given month, the electricity charges would have been different than what "Simon" charged "had Simon actually charged" a certain rate. (Am. Compl. ¶¶ 39-45, 68-73.) But Plaintiffs' calculations of what they should have been billed are based upon a false characterization of what the Lease provisions actually state, and are conclusory in any event because they do not explain how the figures were arrived at.[16]  Moreover, these allegations attribute the conduct to "Simon," generally, but only the Trust (or Simon Property Texas) issued electricity charges. (*See* Ex. 4 to Am. Compl. (Gelato Invoice); Ex. 7 to Am. Compl. (Pete's Burgers Invoice).)  Furthermore, the terms of the Leases expressly preclude all of the claims asserted against three of the defendants: Simon Property, Simon Partnership, and M.S. Management. Specifically, Plaintiffs allege that Simon Partnership "holds, directly or indirectly, substantially all of Simon [Property]'s assets," that M.S. Management "is one of Simon [Property's] and Simon Partnership's significant subsidiaries," and that "Simon [Property], through Simon Partnership, created a single purpose entity, The Trust[.]" (Am. Compl. ¶¶ 12, 14, 21.)  Based on these allegations, the non-Trust Defendants are holders of an equity interest in the Trust, or in an entity comprising the Trust or its partners. Consequently, under the Leases' Limitation of Liability provision, Plaintiffs are contractually barred from attempting to hold the non-Trust Defendants liable. (Leases, § 24.13.)

The express terms of the Leases directly contradict Plaintiffs' core allegations, and all of their causes of actions are barred for this reason (among other defects detailed below).

---

[16] Plaintiffs also distort the Leases by asserting that they contain audit waiver provisions that allegedly require "the tenants at those shopping malls to waive any right to audit the invoices and records to determine whether they were actually being charged the correct amount for electricity." The Leases do not contain any waiver of audit rights for electrical charges. The audit waiver provision cited (Section 6.2) has nothing to do with electrical charges. Section 6.2 refers to an unrelated "Operating Costs (OC) Charge."

**C. Plaintiffs Fail to State a Claim for Violations of RICO, 18 U.S.C. § 1962(a), (c)-(d) (Count I) and the Florida RICO Act (Count IV).**

Plaintiffs attempt to recast their breach of Lease claims as "predicate acts of mail and wire fraud" supporting RICO claims. But they ignore the established principle that a plaintiff should not take "a simple breach of contract or garden-variety fraud claim and attempt[ed] to boot-strap it into a 'federal case' by couching the allegations in [RICO] statutory language. This is not the purpose for which RICO was enacted." *Robert Suris General Contractor Corp v. New Metropolitan Federal Savings & Loan Association,* 873 F.2d 1401, 1404 (11th Cir. 1989) (quoting the district court's order).[17] Plaintiffs' nebulous allegations of violations of Florida and Texas "state laws and regulations" do not change the character of this matter; it is a claim predicated upon an alleged breach of contract. Plaintiffs' RICO claims are fundamentally flawed.

Rule 9: Plaintiffs' RICO claims fail to satisfy the fundamental pleading requirements of Rule 9(b). Even though Plaintiffs generally allege a breach of Lease, they fail to plead with specificity how such a breach constitutes mail or wire fraud. *Viridis Corporation v. TCA Global Credit Master Fund*, LP, 155 F.Supp.3d 1344, 1361 (S.D. Fla. 2015) *citing Amer. Dental Ass'n v. Cigna Corp*., 605 F.3d 1283, 1291 (11th Cir.2010). To satisfy the specificity requirement, allegations of these predicate acts must include "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1380–81 (11th Cir.1997). While Plaintiffs cite provisions of the Leases, which are misrepresented,

---

[17] Because interpretation of Florida's RICO laws is otherwise informed by decisions interpreting the federal RICO statute, the two claims are addressed herein together except where Florida law differs from section 1962. *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1263 (11th Cir. 2004). Florida also declines to allow a breach of contract to stand as the basis for a state law RICO claim. See below, pp. 16-17.

they fail to sufficiently identify any specific misrepresentation, statement or any specific offending invoice, let alone how the statements were allegedly false.[18]   In the Amended Complaint, Plaintiffs cite a number of specific invoices (¶¶ 39-45, 68-73), but they still do not sufficiently allege the costs that would be charged to Tenant by the utility company if it provided such services and metered the same directly to the Premises, or "the cost Landlord must pay in providing such electrical service"—the necessary touchstones under the Leases.   Ultimately, as stated above, Plaintiffs' calculations of what they should have been billed are based upon a false characterization of the express Lease provisions actually state and lack the proper methodology.

Rule 9(b) also demands that "[i]n a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008). Plaintiffs fail here as well, by conflating the Defendants together without identifying the specific acts that each allegedly committed. *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1293 (S.D. Fla. 2008) ("The Plaintiff must allege facts with respect to each Defendant's participation in the fraud.").   Plaintiffs fail to satisfy the requirement that fraud be pleaded with specificity imposed by Rule 9.

18 U.S.C. § 1962(c): The primary RICO statute, § 1962(c), requires a plaintiff to plausibly allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.   *Viridis*, 155 F. Supp. 3d at 1354. If Plaintiffs fail to state a substantive RICO claim, their conspiracy claim under § 1962(d) also fails. *Viridis*, 155 F. Supp. 3d at 1365-66. Plaintiffs cannot state a colorable RICO claim for the following reasons:

---

[18]  Plaintiffs' allegations of violations of "state laws and regulations" fare no better.  Those vague allegations do not serve as an alleged basis for the RICO count, and are a complete distraction.

Enterprise: Plaintiffs allege that "Simon, Simon Partnership, M.S. Management, Valquest, Simon Property Group Texas, and the Trust, along with other unidentified co-conspirators, were associated-in-fact for the common purpose of engaging in the Defendants' profit-making scheme." (Am. Compl. ¶ 110.)  Plaintiffs cannot state any claim relating to electricity charges under the Leases against Simon Property, Simon Partnership, and M.S. Management as a matter of contract. As discussed above, under Section 24.13 of the Leases, the non-Trust Defendants shall not "be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease."  Those Defendants therefore cannot be part of any RICO "enterprise" as a matter of law.

The Trust also cannot be part of an "enterprise." The definition of "enterprise" in section 1961(4) does not include trusts and "[a] trust is neither a legal entity nor an association-in-fact," but rather falls "within [the] class of intangible rights that cannot constitute a legal entity enterprise under RICO." *Abromats v. Abromats*, No. 16-CV-60653, 2016 WL 4917153, at *12 (S.D. Fla. Sept. 15, 2016) (quoting *Bonner v. Henderson*, 147 F.3d 457, 459 (5th Cir. 1998)). Further, it is not alleged how the Trust (a Florida mall owner), as an alleged member of an enterprise, could have affected interstate or foreign commerce. *Flippo v. Stiles*, No. 13-80649-CIV, 2014 WL 3667876, at *2 (S.D. Fla. July 22, 2014) (predicate acts must affect interstate or foreign commerce).  The Trust cannot form, or be a member of, the alleged RICO enterprise as a matter of law.

Nor can Plaintiffs allege that Defendants are sufficiently distinct.  In order to state a civil RICO claim under section 1962(c), "a plaintiff must establish a distinction between the defendant 'person' and the 'enterprise' itself." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1355 (11th Cir. 2016). Simon Property, Simon Partnership, M.S. Management, and the Trust lack distinctiveness

because they are alleged to be related affiliates under common ownership and are not adequately pleaded to be distinct from one another, or the enterprise itself, as required. *See Allen v. First Unum Life Ins. Co.*, No. 2:18-CV-69-FTM-99MRM, 2019 WL 1359480, at *5 (M.D. Fla. Mar. 26, 2019) (holding and parent company was not distinct from subsidiaries, and allegations against third-party associates of enterprise were devoid of "specific statements, documents, misrepresentations, time, place, or person(s) responsible for [such] statement[s]"); *see also Kirchner v. Ocwen Loan Servicing, LLC*, No. 1:16-CV-23950-UU, 2017 WL 7411027, at *7 (S.D. Fla. Mar. 15, 2017).  Far from alleging such distinction, Plaintiffs lump them together, alleging that "Simon [Property] and Simon Partnership, along with its various affiliates, operate as one company with overlapping directors, management, and employees." (Am. Compl. ¶ 13.)

To sufficiently plead an association-in-fact enterprise, a plaintiff is required to show (1) a common purpose shared by the associates of the enterprise; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Ray*, 836 F.3d at 1352 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).  Plaintiffs fail to sufficiently allege facts showing how Defendants had a common purpose, how the entities' relationships were anything besides a real estate investment trust and mall operator, and how all of the Defendants' relationships had some longevity sufficient to permit them to pursue a racketeering purpose.  There are no sufficient allegations of an "enterprise" as required under 18 U.S.C. § 1962(c).

Pete's Burgers' RICO claim is especially deficient with respect to any "enterprise" allegedly involving Valquest.  Plaintiffs allege that, "As with the other shopping centers, including at TCBR, Valquest provided energy surveys for the tenants at Firewheel that were used to estimate energy costs for the storefront locations or to substantiate the energy costs that either M.S.

Management or Simon billed its tenants, including Pete's Burgers."  (Am. Compl., ¶ 62; *see also id.* ¶ 63 ("Simon and Valquest knew the Valquest surveys associated with Pete's Burgers at Firewheel were inaccurate . . .").)  But Plaintiffs' own exhibits facially negate those allegations— Valquest had no involvement with providing any energy survey for Pete's Burgers at Firewheel. Rather, the electric consumption and demand of Pete's Burgers was determined by Landlord using measurements from a dedicated submeter.  (*See* Ex. 8 to Am. Compl. (Pete's Burger Charge Backup Report) at "Load Basis" Column, indicating ("Metered"); *compare to* Ex. 5 to Am. Compl. (Gelato Charge Backup Report) at "Load Basis" Column, indicating "FVS" (Valquest's Field Verified Study).)

Pattern of Racketeering: To establish a pattern of racketeering activity, a plaintiff must identify at least two acts of racketeering activity within a ten-year period.  18 U.S.C. § 1961(5). Defendants' alleged racketeering activity here "consisted of numerous and repeated violations of the federal mail and wire fraud statutes… 18 U.S.C. §§ 1341 and 1343." (Am. Compl. ¶ 114.) A civil RICO claim predicated on mail or wire fraud must allege with particularity the elements of the predicate offense; "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiff[], (2) that they did so willingly and with an intent to defraud, and (3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1323, 1328 (S.D. Fla. 2011) (quoting *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000)); *Viridis*, 155 F. Supp. 3d at 1361. Plaintiffs are required to allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir.

2010) (quoting *Brooks*, 116 F.3d at 1380-81). Those allegations are not present here. While Plaintiffs make the conclusory allegation of "thousands" of violations, (Am. Compl. ¶ 110), they fail to state any specific facts regarding even a single violation, and their new "calculations" of rates are based upon a false application of the express terms of the Lease. They do not sufficiently allege what the alleged specific misrepresentations were, how the statements were false, when the statements were made, or how Plaintiffs were supposedly misled. Plaintiffs refer to some monthly invoices in the Amended Complaint, but they still do not plead what the utility or service provider would have charged (*i.e.*, what the "costs" would have been if directly metered), what the Landlord's "costs" were to provide such electrical service, or how each Defendant participated in any such misrepresentation. "Check-the box" pleading is insufficient for RICO. Simply alleging that invoices were sent, even if they purportedly contained errors, is not enough. *In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1323, 1332 (S.D. Fla. 2011) ("wrongful overcharges, at least under these facts and when permitted by contract, are not synonymous with the meaning of 'misrepresentation' in the context of the RICO statute").

In addition, Gelato cannot allege a RICO pattern which requires "predicate acts demonstrat[ing] criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original). The predicate acts here are not alleged with the required continuity, and, again, conclusory allegations are insufficient. *See Jackson*, 372 F.3d at 1268. There can be no pattern or continued threat here because Gelato's lease has expired by its own terms. Gelato alleges that its Lease was executed in October 2014 for a five-year term. (Am. Compl. ¶ 23.) Since the Gelato Lease expired and the premises were abandoned, there can be no conduct of a continuing nature. At best, with an expired lease, Gelato can only plead "closed-ended" continuity. But even then, as with Pete's Burgers, it has not pleaded any facts

28

demonstrating a pattern of predicate acts over a substantial period of time. For all these reasons, Plaintiffs fail to state a RICO claim under 18 U.S.C. § 1962(c).

18 U.S.C. § 1962(a): In the absence of a viable claim under section 1962(c), there can be no claim under section 1962(a). *Genord v. Blue Cross and Blue Shield of Mich.*, 2008 WL 5070149, at *4 (S.D. Fla. Nov. 24, 2008). Gelato also fails to state a RICO claim for a violation of 18 U.S.C. § 1962(a) because the essence of a section 1962(a) claim is the investment of racketeering income. To state a claim under section 1962(a), a plaintiff is required to "show an injury resulting from the investment of racketeering proceeds." *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1341 (S.D. Fla. 2008). Gelato generally alleges that "Simon [Property], Simon Partnership, M.S. Management, the Trust, Valquest (although not named as a defendant), and other unnamed co-conspirators received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce." (Am. Compl. ¶ 118.) These averments lack factual specificity to satisfy the general pleading standard required by Fed. R. Civ. P. 8(a), let alone the heightened pleading required for RICO claims based in fraud under Fed. R. Civ. P. 9(b). It is insufficient to simply recite elements by label without supporting facts. *Am. Marine*, 418 F. Supp. 3d at 1079. Section 1962(a) requires an "investment injury," *i.e.* that a plaintiff's damages be caused by the investment in the enterprise rather than by the underlying predicate acts. *Kaczmarek v. International Business Machines Corp.*, 30 F.Supp.2d 626, 628 (S.D.N.Y. 1998) *citing Quacknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990); *Super Vision*, 534 F. Supp. 2d at 1341 (dismissing RICO claim under section 1962(a) where plaintiff "failed to allege that it [had] suffered an injury resulting from [defendant bank's] alleged investment of the fees and charges it retained from [third-party debtor's] accounts"). Plaintiffs added an allegation in the Amended Complaint relating to how Simon

Property allegedly "used the profits[.]" (*Id.* ¶ 119.)  But Plaintiffs still fail to allege any facts as to how their damages were actually *caused* by investment in the enterprise, distinct from the underlying predicate acts, or how the various Defendants were supposedly involved in any such investment.  For these reasons, Plaintiffs fail to state a RICO claim under section 1962(a).

18 U.S.C. § 1962(d): Because Plaintiffs cannot state a substantive RICO claim under §§ 1962(a) or (c), their conspiracy claim also fails. *Viridis*, 155 F. Supp. 3d at 1365-66. Section 1962(d) requires a plaintiff to "allege an illegal agreement to violate a substantive provision of the RICO statute." *Viridis*, 155 F. Supp. 3d at 1365; *see also Solomon*, 574 F. Supp. 2d at 1291. Plaintiffs claim only that Defendants engaged in a conspiracy based upon "certain agreements entered into between and among Simon [Property], Simon Partnership, M.S. Management, Simon Property Group, Valquest, and other unnamed co-conspirators."  (Am. Compl. ¶ 113.)  Such a threadbare conclusion cannot state a claim for a RICO conspiracy.  For example, there are no allegations as to how The Trust—the Florida mall Landlord, signatory to the Gelato Lease, and the billing entity—was involved in any "conspiracy."  And Plaintiffs' own exhibits negate their allegation that Valquest was involved at all with the Pete's Burgers store in the Texas mall.

Plaintiffs added an allegation relating to a supposed meeting between Simon Property and Valquest. (*Id.* ¶ 113.)  However, they fail to plead any facts relating to how the various Defendants were involved in that "conspiracy," or how an alleged 2005 meeting impacted a subset of invoices over a decade later, in 2016 and 2019, as alleged. Again, even based on a review of Plaintiffs' own exhibits, it is clear that Pete's Burgers was separately metered and therefore would not have involved Valquest at all.  These deficiencies are fatal to Plaintiffs' claim under section 1962(d). *See Viridis*, 155 F. Supp. 3d at 1366 (dismissing conspiracy claim and explaining that "the fact that Plaintiffs failed to allege that there was an agreement between [defendants] to commit a

criminal act is a glaring deficiency in Plaintiffs' pleading of a civil conspiracy claim under RICO"); *see also Jackson*, 372 F.3d at 1269 ("[T]he plaintiffs have failed to allege that the BellSouth defendants agreed to violate any of the substantive provisions of the RICO laws. Because of this fatal pleading defect, the plaintiffs' RICO conspiracy claims are likewise unable to survive the defendants' motion to dismiss"). Plaintiffs fail to state a claim for RICO conspiracy in violation of 18 U.S.C. § 1962(d).

<u>Florida RICO:</u> Florida's RICO law is patterned after the federal statutes; thus, Florida court decisions interpreting section 1962 are persuasive authority for interpreting the state law. *Jackson*, 372 F.3d at 1263-64. Likewise, claims under the Florida RICO Act are subject to the pleading requirements of Rule 9(b). *See Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, No. 13-23998-CIV, 2017 WL 11103938, at *9 (S.D. Fla. June 26, 2017) (citing *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007)). To the extent that Café Gelato's federal RICO claim fails to satisfy Rule 9 as argued above, its state law claim also fails.

Gelato cannot establish a pattern of criminal activity under the Florida statute, which provides that "the term 'pattern of criminal activity' *shall not include two or more incidents of fraudulent conduct arising out of a single contract* or transaction against one or more related persons." *Id.* (emphasis added). Here, there is no pattern of criminal activity because the alleged mail and wire fraud arises out of a single contract, the Lease. *See Confianca Mudancas e Transportes Ltda v. Confianca Moving, Inc.*, No. 09-21763-CIV, 2009 WL 10668285, at *2 (S.D. Fla. Sept. 29, 2009) (explaining that where multiple misrepresentations were made over period of several months to induce party to enter into licensing contract, "these incidents of alleged fraudulent conduct 'arise out of' the formation of a 'single contract or transaction'" and thus "are

'automatically excluded' from RICO liability"); *see also Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 864 (Fla. 4th DCA 2012).

For these reasons, Gelato fails to state a claim under the Florida RICO Act, and Count IV should be dismissed.

**D. <u>Plaintiffs Fail to State a Claim for Unjust Enrichment (Count II).</u>**

Plaintiffs' claim for unjust enrichment (Count II) against Simon Property, Simon Partnership, and M.S. Management should be dismissed as well.  Under Florida law,  there can be no recovery under an unjust enrichment claim where, as here, an express contract exists. *Williams v. Johnson*, 232 So. 3d 483 (Fla. 3d DCA 2017); *Kovtan v. Frederiksen*, 449 So. 2d 1 (Fla. 2d DCA 1984).

Plaintiffs' unjust enrichment claim is, again, based on an erroneous reading of the Leases. For example, the Amended Complaint states, "Instead of charging tenants only for what the shopping malls were charged for electricity as was promised, Simon [Property], Simon Partnership, and M.S. Management charged Plaintiffs and the members of the Classes substantially more for that electricity, retaining the excess amount as unearned profit for themselves."  (Am. Compl., ¶ 124.)  But as stated previously, the Leases do not say that the tenants would be charged the amount that the *landlords* were charged by the utility.  Rather, the Leases state that the tenant will be charged the "same cost as would be charged to Tenant from time to time by the utility company [and/or alternate provider as designated by Landlord[19]] which otherwise would furnish such services to the Premises … but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service."  (Leases, § 7.1.)

---

[19] Bracketed language appears only the Pete's Burger Lease and does not appear in the Gelato Lease.

Moreover, "[n]o unjust enrichment claim is actionable unless a plaintiff has conferred a *direct benefit* on the defendant." *Cutler v. Voya Fin., Inc.*, No. 18-20723-CIV, 2018 WL 4410202, at *10 (S.D. Fla. Aug. 23, 2018); *see also Wilson v. Cinemark Corp.*, 858 S.W.2d 645, 648 (Tex. App. 1993). Here, Plaintiffs fail to allege how the class members conferred a *direct* benefit on Simon Property, Simon Partnership, and M.S. Management when electricity charges were paid to the Trust (or the non-party Simon Texas). *See Cutler*, 2018 WL 4410202, at *10-12 & n.8 ("in cases where a plaintiff alleges unjust enrichment against a parent corporation but only contracted with the subsidiary, courts have routinely granted motions to dismiss because there is no plausible direct benefit that can be conferred on a parent organization."). *Peiqing Cong v. ConocoPhillips Co.*, 250 F. Supp. 3d 229, 234 (S.D. Tex. 2016). Plaintiffs do not, and cannot, allege that they paid the non-landlord Defendants anything. The unjust enrichment claim must be dismissed.

E.  **Gelato Fails to State a Claim for Violation of the Florida Deceptive and Unfair Trade Practices Act (Count III).**

Gelato's claim for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count III) should also be dismissed.

The claim is exempted under Section 501.212(5) of FDUTPA. Section 501.212(5) of the Act creates a specific exemption from suit under FDUTPA for "[a]ny activity regulated under the laws administered by the Florida Public Service Commission." Here, the Amended Complaint explicitly alleges that all Defendants—including the Trust—are supposedly violating a Florida electricity regulation, Fla. Admin. R. 25-6.049(9)(b). (Am. Compl., ¶ 49.) That regulation falls under Title 25 of the Florida Administrative Code—titled "Public Service Commission"—and relates to "[a]ny fees or charges collected by a customer of record for electricity billed to the customer's account by the utility . . . ." (Emphasis added.) Specifically, Plaintiffs claim that

Defendants "violated Florida law when they re-sold electricity to Gelato and their other Florida tenants." (*Id.*)   Gelato's claim therefore falls squarely into the exemption of FDUTPA § 501.212(5).

Gelato Fails to Sufficiently Plead the Required Elements.   In addition to the statutory exemption, Gelato also fails to state a FDUTPA claim, especially under the specificity requirements of Rule 9(b).[20]   To establish a claim under the FDUTPA, a plaintiff must show: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.   *Hucke v. Kubra Data Transfer, Corp.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015).   A deceptive act or practice "is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.*  Gelato's allegations fall short of pleading a cognizable claim for a violation of FDUTPA.

First, there is nothing "deceptive" or "unfair" about the Gelato Lease.  As stated above, the express terms of the Gelato Lease preclude this claim and permit the Trust to charge for electricity a certain way, and Gelato's claims of "misrepresentations" are based solely on its own misrepresentation of the clear terms of the Lease.

Second, Gelato does not sufficiently plead damages.  FDUTPA authorizes a person "who has suffered a loss" as a consequence of a violation of the statute to recover "actual damages." Fla.

---

[20] While "[f]ederal district courts have split as to whether FDUTPA claims are subject to Rule 9(b)," courts have concluded that "where the gravamen of the claim sounds in fraud, . . . the heightened pleading standard of Rule 9(b) applies." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1328 (S.D. Fla. 2017).  Additionally, Gelato fails to identify the precise statements and alleged misrepresentations, the time and place of any misleading statements, the months or years it believes it was overcharged, or against what benchmark—what the local utilities would have charged during those periods, and what Simon's cost to provide electricity during those times would have been.  Defendants are entitled to know exactly what actions they must defend against.

Stat. § 501.211(2); *Jovine v. Abbott Labs Inc. d/b/a Abbott Sales*, 795 F. Supp. 2d 1331, 1344 (S.D. Fla. 2011) (citations omitted).  In the context of FDUTPA, "actual damages" have been defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  *Id.* (quoting *Rollins, Inc. v. Heller,* 454 So.2d 580, 585 (Fla. 3d DCA 1984)).  Gelato only states "Plaintiff Café Gelato, the Florida Statutory Class, and the TCBR Class have been damaged in an amount to be proven at trial" and are "entitled to actual damages." (Am. Compl. ¶¶ 134-35.)  That is not enough.  Gelato must identify its "actual damages" so Defendants and the Court can determine if they are recoverable under FDUTPA.  Finally, Gelato also fails to sufficiently plead causation.  Gelato fails to set forth more than conclusory allegations in support of its claim that Defendants caused it purported damages.  (*See id.*)

**F.  <u>Gelato Fails to State a Claim for Breach of Contract (Count V).</u>**

Under Florida law, the elements of a breach of contract claim are (1) a valid contract; (2) a material breach; and (3) damages.  *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1366-67 (S.D. Fla. 2017) (citations and internal quotation marks omitted).

Here, Gelato is alleging a "breach" of terms that do not exist in the Lease and attempts to re-write the plain terms of the Lease, for the reasons stated previously.  Where an exhibit "facially negates the cause of action asserted," as is the case here, "the … exhibit controls and must be considered in determining [the Motion].  *Fellner v. Cameron*, 2012 WL 5387696, at *4 (M.D. Fla. Oct. 5, 2012) (quoting *Fladell v. Palm Beach County Canvassing Bd.*, 772 So.2d 1240, 1242 (Fla. 2000)).  A review of the Lease here confirms that this claim must be dismissed.  *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1340 (S.D. Fla. 2012) (dismissing breach

of contract claim where plaintiffs failed "to point toward an express provision in the contract that creates the obligation allegedly breached").

**G.**   **Gelato Fails to State a Claim for Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing (Count VI).**

The Eleventh Circuit has held that "no independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1317 (11th Cir. 1999). Where a party to a contract "has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie. More specifically, a cause of action for breach of the implied covenant cannot be maintained (a) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract." *Burger King*, 169 F.3d at 1317-18. The "implied covenant of good faith and fair dealing confers limited rights. . . . [T]he covenant is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*." *Id.* at 1316-17 (citation and internal quotation marks omitted).

But the allegations in Count VI are nearly identical to the allegations in the breach of contract claim, and it should therefore be dismissed as duplicative. Gelato also fails to allege any facts relating to Gelato's reasonable expectations, or how the Trust breached them. Gelato's expectations are irrelevant and are set by the provisions of the Lease dealing with electrical services and audits, which are already at issue in the deficient breach of contract claim. Thus, Count VI should be dismissed as well.

**H. Pete's Burgers' Claims Should be Dismissed Outright Because the Texas Regulation Allegedly Violated Does Not Apply.**

Pete's Burgers' claims should all be dismissed outright as a matter of law because the Texas regulation cited does not apply.  In the Amended Complaint, Plaintiffs assert that Defendants violated subsection a(1) of 16 TAC §25.107 by reselling electricity to Pete's Burgers without certification as a Retail Electric Provider ("REP").  (Am. Compl. ¶¶ 77-78.)  Under 16 TAC § 25.107, a person must obtain a REP certificate from the PUCT before providing electric service to retail customers in an area where customer choice is in effect.  Pete's Burgers' allegations of a violation of this regulation are incorrect as a matter of law and are based on a misunderstanding of the regulation of electricity in Texas.  As the Amended Complaint acknowledges, Pete's Burgers leases space at Firewheel within the City of Garland, and Firewheel's electricity is provided by the City of Garland's municipally owned electric utility ("MOU").  (Am. Compl. ¶¶ 10, 67.)[21] Because the property at issue is located within Garland Power & Light's ("GP&L") exclusive service area, GP&L has the sole right to sell electric service at retail to end-use customers, and REPs are prohibited from being certificated by the PUCT to sell electricity at retail in GP&L's service area.  Because Firewheel is located within the exclusive service area of GP&L, an MOU that is not open to retail competition, the REP certification requirements under 16 TAC § 25.107 do not apply, as further described on pp. 29-34 *infra*.

**I. Pete's Burgers Fails to State a Claim for Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Count VII).**

Pete's Burgers' new claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") must also be dismissed under Rule 12(b)(6).

---

[21] The Amended Complaint references the "City of Garland Utility Services"; however, the name of the city's MOU is Garland Power & Light.

The DTPA permits a consumer to bring an action where any of the following produce economic damages or damages for mental anguish: (1) the use or employment of a "false, misleading, or deceptive act or practice" specifically enumerated in § 17.46(b) (containing a nonexhaustive list of unlawful conduct) that the consumer relied on to its detriment; (2) breach of an express or implied warranty; or (3) "any unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a).  "[C]laims alleging misrepresentation and fraud in violation of the . . . DTPA are subject to the heightened pleading requirements of Rule 9(b)." *Harris Cty. v. Eli Lilly and Co.*, No. CV H-19-4994, 2020 WL 5803483, at *15 (S.D. Tex. Sept. 29, 2020) (citation omitted) (dismissing DTPA claim where plaintiff alleged "no facts about the amount of the transactions for the defendants to dispute" and thus did not plead "sufficient facts to demonstrate that the statute applies").  As with Gelato's defective FDUTPA claim, Pete's Burgers fails to satisfy the heightened pleading requirements of Rule 9(b).

Moreover, there is nothing "deceptive" or "unfair" about the Pete's Burgers Lease, and a breach of contract claim cannot be transformed into a DTPA claim.  "An allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Gallegos v. Quintero*, No. 13-16-00497-CV, 2018 WL 655539, at *4 (Tex. Ct. App. Feb. 1, 2018) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996)). Furthermore, any claim under § 17.46(b)(12) fails because Pete's Burgers has not alleged that it or the Texas Statutory Class relied to their detriment on any misrepresentation of the Lease, as required under § 17.50(a)(1).

**J.  Pete's Burgers' Claims Should be Dismissed under Rule 12(b)(2), (3), and (7).**

Pete's Burgers' claims for unjust enrichment (Count II) and violation of DTPA (Count VII) should also be dismissed because the Court lacks personal jurisdiction over the Defendants with

respect to those claims.

Plaintiffs assert that personal jurisdiction here derives from Florida's long-arm statute, Fla. Stat. § 48.193, and the federal RICO statute, 18 U.S.C. § 1961. (Am. Compl. ¶¶ 18-19.)  Because the RICO claim should be dismissed here under Rule 12(b)(6), for the reasons above, the remainder of Pete's Burgers' claims should be dismissed for lack of jurisdiction.[22]  *See Leon v. Cont'l AG*, 301 F. Supp. 3d 1203 (S.D. Fla. 2017).

Absent any alleged federal jurisdiction under the RICO statute, the Court is required to apply Florida's long-arm statute to determine whether Pete's Burgers has sufficient contacts with Florida. *See Story v. Heartland Payment Sys., LLC*, No. 3:19-CV-724-J-32JBT, 2020 WL 2559755, at *6 n.12 (M.D. Fla. May 20, 2020). That analysis, in turn, requires an examination of the claims asserted by Pete's Burgers and whether it would be appropriate for the Defendants "to answer" those claims in Florida. *Id.* at *9 n.20.

Pete's Burgers is a Texas restaurant doing business in a Texas mall.  Its claims for unjust enrichment and violation of the Texas unfair trade law—based on its Texas lease with its landlord, Simon Texas—have nothing to do with Florida.  As an out-of-state plaintiff, it cannot piggy-back onto any jurisdiction demonstrated by Gelato.  *See id.* at *9.  Ultimately, there is "no reason why

---

[22] Pete's Burgers' claims should also be dismissed under Rule 12(b)(7) for failure to join an indispensable party—Simon Texas.  Under Rule 19(a), Simon Texas is a necessary party for Pete's Burgers' claims.  For example, failure to join Simon Texas deprives the Court the ability to accord complete relief to the Plaintiffs should a judgment be entered in their favor, as Simon Texas—according to the Plaintiffs' Amended Complaint—"retained" profits from the Defendants' unlawful scheme. (Am. Compl. ¶¶ 109, 120.) At least one Florida court has deemed joinder necessary under Rule 19 where the nonparty "possesses funds improperly obtained" from the plaintiff. *See Gadd v. Pearson*, 351 F. Supp. 895, 902 (M.D. Fla. 1972).  The absence of Simon Texas would also have a prejudicial effect on its ability to protect its contractual interests with Pete's Burgers and its other tenants in Texas. In a recent class action case, the Eleventh Circuit accepted for purposes of argument that where the dispute at issue centers on the defendants' contractual obligations, a signatory to that contract is considered a necessary party under Rule 19. *See Santiago v. Honeywell Int'l, Inc.*, 768 F. App'x 1000, 1006-07 (11th Cir. 2019).  Moreover, the absence of Simon Texas could result in the parties incurring inconsistent obligations in the future. Under Rule 19(b), joinder would not be feasible here.  As discussed above, the RICO claim should be dismissed, and without that federal jurisdiction, there would be no jurisdiction here over Simon Texas.

personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction." *Id*. at \*10 (citation omitted). As federal courts in this district have found, "[i]mposing personal jurisdiction on [a] defendant for all of the claims of non-resident plaintiff, just because specific jurisdiction may lie as to the resident plaintiff's claims, would run afoul of the traditional notions of fair play and substantial justice that form the bedrock of any court's personal jurisdiction analysis." *Id*. (quotation marks and brackets omitted). Pete's Burgers has no contacts with the state of Florida and, like the non-resident plaintiffs in *Heartland*, have not alleged claims arising in Florida. Similarly, the Simon entities, like Heartland, are not incorporated or otherwise maintain their principal place of business in Florida. Pete's Burgers should therefore be dismissed on personal jurisdiction grounds. *See also Lee v. Branch Banking & Tr. Co.*, No. CV 18-21876-CIV, 2018 WL 5633995, at \*4 (S.D. Fla. Oct. 31, 2018).[23]

## III.    CONCLUSION

WHEREFORE, Defendants move this Honorable Court for entry of an Order dismissing with prejudice Plaintiffs' Amended Complaint or, in the alternative, to abstain, together with such other and further relief as the Court may deem just and appropriate under the circumstances.

---

[23] The Court should also dismiss the Amended Complaint under Rule 12(b)(3) for improper venue. Even if the Court decides it has jurisdiction here, "a substantial part of the events or omissions giving rise to the claim occurred" outside of Florida, making venue improper for the entire Amended Complaint, or at the very least, Pete's Burgers' Texas claims for unjust enrichment and violation of the Texas unfair trade law. A "substantial part" of events giving rise to the allegedly unlawful conduct did not occur in Florida, but rather in Indiana where Simon is. For example, according to the Amended Complaint, the Defendants' alleged "scheme" involved a 2005 meeting between Simon and the CEO of Valquest and was then supposedly carried about with the help of M.S. Management and The Trust. (*See* Am. Compl. ¶¶ 35-48.) None of these entities are domiciled in Florida, nor is there any indication in the Amended Complaint that the alleged conversations regarding the scheme took place in Florida. Moreover, the Plaintiffs aver Simon's tenants across the country received and sent checks "to Simon's offices in Illinois [*sic*]." (*Id*. ¶¶ 74, 84.) Without more, the mere fact "that the activities of [d]efendants outside the state of Florida are alleged to have caused injuries to a Florida company in Florida" are insufficient for purposes of conferring venue in Florida. *TMJ Practice Mgmt. Assocs., Inc. v. Curran*, No. 16-81903-CIV, 2017 WL 3130421, at \*3 (S.D. Fla. July 24, 2017). Given the Eleventh Circuit's "narrow[]" interpretation of Section 1391(b)(2), *id*., a "substantial part" of the events giving rise to the Plaintiffs' claims occurred outside of Florida.

Respectfully submitted,

Dated: November 16, 2020          BERGER SINGERMAN LLP

*/s/ Fred O. Goldberg*
Mitchell W. Berger
Florida Bar No. 311340
mberger@bergersingerman.com
Fred O. Goldberg
Florida Bar No. 898619
fgoldberg@bergersingerman.com
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

BLANK ROME LLP
James T. Smith (*admitted pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: 215-569-5500
Facsimile: 215-569-5555
Smith-jt@BlankRome.com

*Attorneys for Simon Property Group, Inc., Simon
Property Group, L.P., M.S. Management
Associates, Inc., and The Town Center at Boca
Raton Trust*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 16, 2020, a true and correct copy of the foregoing has been transmitted by electronic filing with the Clerk of the court via CM/ECF which will send notice of electronic filing to all counsel of record.

By:   <u>   */s/ Fred O. Goldberg*   </u>

Fred O. Goldberg