**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| CAFÉ, GELATO & PANINI LLC, d/b/a/ CAFÉ GELATO PANINI, on behalf of itself and all others similarly situated, | : : : : : | |
| | : | |
| Plaintiff/Counterclaim Defendant, | : : | CIVIL ACTION |
| v. | : : | Civil Action No. 0:20-cv-60981-AMC |
| | : | |
| SIMON PROPERTY GROUP, INC., SIMON PROPERTY GROUP, L.P., M.S. MANAGEMENT ASSOCIATES, INC., and THE TOWN CENTER AT BOCA RATON TRUST, | : : : : : | |
| | : | |
| Defendants/Counterclaimants. | : : | |

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT .............................................................................................................................2

    A.    Legal Standard on a Motion for Summary Judgment. ..............................................2

    B.    Plaintiff's Breach of Contract Claim Fails as a Matter of Law. ..............................3

        1.    Section 7.1 Overview. ...................................................................................3

        2.    The Language of Section 7.1 Is Unambiguous. .............................................5

        3.    Plaintiff's Breach of Contract Claim Should Be Dismissed for Failure to Provide Notice of Default and for Failure to Object. ..................................11

    C.    Plaintiff's Federal and Florida RICO Claims Fail as a Matter of Law. .................12

        1.    The Undisputed Record Disproves Plaintiff's RICO Allegations. .............12

        2.    Plaintiff Cannot Establish a Cognizable RICO Claim. ..............................16

        3.    Plaintiff's Claims of Investment Injury and Conspiracy also Fail. ............25

    D.    The RICO, FDUTPA, and Unjust Enrichment Claims are Barred. ......................26

    E.    The RICO, FDUTPA, and Unjust Enrichment Claims Are All Untimely. ...........26

        1.    Plaintiff's Claims Are Time-Barred. ..........................................................26

        2.    Plaintiff Is Not Entitled to Equitable Tolling. ............................................27

    F.    Plaintiff's FDUTPA Claim Fails as a Matter of Law. ...........................................28

    G.    Defendants Are Entitled to Summary Judgment on Plaintiff's Unjust Enrichment Claim. ................................................................................................30

    H.    The Trust Is Entitled to Summary Judgment on Its Counterclaim. .....................30

        1.    Plaintiff Vacates Its Premises Owing $318,197.42 in Unpaid Rent. ........31

        2.    The Trust Is Entitled to Judgment as a Matter of Law. .............................31

CONCLUSION........................................................................................................................32

**TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*3455 LLC v. ND Properties, Inc.*,
   2014 WL 3845696 (N.D. Ga. Aug. 5, 2014) ...........................................................12, 32, 33

*3455, LLC v. ND Properties, Inc.*,
   631 F. App'x 701 (11th Cir. 2015) ...............................................................................32

*Abrams v. Ciba Specialty Chemicals Corp.*,
   663 F. Supp. 2d 1220 (S.D. Ala. 2009)...................................................................20, 21

*Abromats v. Abromats*,
   2016 WL 4917153 (S.D. Fla. Sept. 15, 2016) .............................................................21

*Accurate Copy Service of Am., Inc. v. Fisk Bldg. Assocs. LLC*,
   2009 WL 1401179 (N.Y. Sup. Ct. May 12, 2009)........................................................9

*Acosta v. Campbell*,
   2006 WL 146208 (M.D. Fla. Jan. 18, 2006)...............................................................18

*Adams, Stevens & Bradley v. Empire State Bldg. Co. L.L.C.*,
   2009 WL 5225175 (N.Y. Sup. Ct. Dec. 23, 2009) .......................................................9

*Almanza v. United Airlines, Inc.*,
   851 F.3d 1060 (11th Cir. 2017) ........................................................................17, 18, 19

*Americold Realty Tr. v. Conagra Foods, Inc.*,
   577 U.S. 378 (2016)...................................................................................................21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................................3

*Angelo v. Parker*,
   275 So. 3d 752 (Fla. Dist. Ct. App. 2019) ...............................................................30

*Apple Glen Invs., L.P. v. Express Scripts, Inc.*,
   700 F. App'x 935 (11th Cir. 2017) ..........................................10 BA_Cite_41C3A2_000311

*Arencibia v. AGA Serv. Co.*,
   533 F. Supp. 3d 1180 (S.D. Fla. 2021) .....................................................................24

*Astro Tel, Inc. v. Verizon Fla., LLC*,
   979 F. Supp. 2d 1284 (M.D. Fla. 2013)....................................................................20

*Azalea Park Utilities, Inc. v. Knox-Fla. Dev. Corp.*,
   127 So. 2d 121 (Fla. Dist. Ct. App. 1961).................................................................27

*Bahamas Sales Assoc., LLC v. Byers*,
  2017 WL 3782804 (M.D. Fla. Aug. 31, 2017) .......................................................................24

*Baker v. Russell Corp.*,
  372 F. App'x 917 (11th Cir. 2010) ........................................................................................3

*Barco Holdings, LLC v. Terminal Inv. Corp.*,
  967 So. 2d 281 (Fla. Dist. Ct. App. 2007) ..........................................................................11

*Beck-Ford Construction, LLC v. TCA Global Credit Master Fund, LP*,
  2018 WL 11422985 (S.D. Fla. 2018) ....................................................................21, 22, 25

*Beltran v. Vincent P. Miraglia, M.D., P.A.*,
  125 So. 3d 855 (Fla. DCA 2013) .........................................................................................26

*Blair v. Wachovia Mortg. Corp.*,
  2012 WL 868878 (M.D. Fla. Mar. 14, 2012) .......................................................................29

*Boyle v. United States*,
  556 U.S. 938 (2009).........................................................................................................17, 19

*Braswell Wood Co. v. Waste Away Grp., Inc.*,
  2010 WL 3168125 (M.D. Ala. Aug. 10, 2010)................................................................21, 23

*Bridge Capital Inv'rs, II v. Susquehanna Radio Corp.*,
  458 F.3d 1212 (11th Cir. 2006) ..............................................................................................5

*Burger King Corp. v. Weaver*,
  169 F.3d 1310 (11th Cir. 1999) ...........................................................................................12

*Cabrera v. Macy's Fla. Stores, LLC*,
  2022 WL 1642762 (S.D. Fla. Mar. 31, 2022).......................................................................2

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ...........................................................................16, 17, 18, 19

*Compton Advertising, Inc. v. Madison-59th Street Corp.*
  398 N.Y.S.2d 607 (N.Y. Sup. Ct. 1977). ...............................................................................8

*Cont'l Cas. Co. v. Cura Grp., Inc.*,
  2005 WL 8155321 (S.D. Fla. Apr. 6, 2005) ...................................................................24, 25

*Coursen v. Shapiro & Fishman, GP*,
  588 F. App'x 882 & 4 (11th Cir. 2014) ...............................................................................26

*Double Park, LLC v. Kaine Parking 125, LLC*,
  168 So. 3d 278 (Fla. Dist. Ct. App. 2015) .............................................................................8

*Downtown Sports, Inc. v. Legacy AH, LLC,*
    2011 WL 13162100 (N.D. Ga. Mar. 11, 2011)......................................................32

*eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.,*
    2022 WL 1320405 (S.D. Fla. May 2, 2022) .......................................................30

*Flagg v. First Premier Bank,*
    257 F. Supp. 3d 1351 (N.D. Ga. 2017) ......................................................18, 26

*GEICO Marine Ins. Co. v. Shackleford,*
    945 F.3d 1135 (11th Cir. 2019) ......................................................27

*Genord v. Blue Cross and Blue Shield of Mich.,*
    2008 WL 5070149 (S.D. Fla. Nov. 24, 2008).......................................................25

*Gilmour v. Gates, McDonald & Co.,*
    382 F.3d 1312 (11th Cir. 2004) ......................................................2

*Glenwood Shopping Ctr. Ltd. P'ship v. K Mart Corp.,*
    356 N.W.2d 281 (Mich. Ct. App. 1984) ......................................................9

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,*
    117 F.3d 1328 (11th Cir. 1997) ......................................................8

*Hochhauser v. Jacobson,*
    795 So. 2d 232 (Fla. Dist. Ct. App. 2001) ......................................................7

*Hudson Pest Control, Inc. v. Westford Asset Mgmt., Inc.,*
    622 So. 2d 546 (Fla. Dist. Ct. App. 1993) ......................................................32

*In re Checking Acct. Overdraft Litig.,*
    797 F. Supp. 2d 1323 (S.D. Fla. 2011) ......................................................22, 23

*In re Colony Square Co.,*
    843 F.2d 479 (11th Cir. 1988) ......................................................11

*Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc.,*
    609 So. 2d 66 (Fla. App. 4 Dist. 1992) ......................................................6

*Jackson v. BellSouth Telecomm.,*
    372 F.3d 1250 (11th Cir. 2004) ......................................................12

*Julian Depot Miami, LLC v. Home Depot U.S.A., Inc.,*
    364 F. Supp. 3d 1354 (S.D. Fla. 2018) ......................................................5

*Kelly v. Palmer, Reifler, & Assocs., P.A.,*
    681 F. Supp. 2d 1356 (S.D. Fla. 2010) ......................................................20

*Kivisto v. Miller Canfield Paddock & Stone PLC,*
    413 F. App'x 136 (11th Cir. 2011) ................................................................21

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997)........................................................................................28

*Kurian v. Wells Fargo Bank, Nat. Ass'n,*
    114 So. 3d 1052 (Fla. Dist. Ct. App. 2013) ..................................................11

*Lombardo v. Johnson & Johnson Consumer Companies, Inc.,*
    124 F. Supp. 3d 1283 (S.D. Fla. 2015) .........................................................30

*Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.,*
    915 So. 2d 220 (Fla. Dist. Ct. App. 2005) ......................................................6

*Maale v. Kirchgessner,*
    2010 WL 11506698 (S.D. Fla. 2010) ............................................................27

*Marler v. U-Store-It Mini Warehouse Co.,*
    416 F. App'x 49 (11th Cir. 2011) ..................................................................26

*McCaleb v. A.O. Smith Corp.,*
    200 F.3d 747 (11th Cir. 2000) .......................................................................27

*Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC,*
    714 F.3d 1234 (11th Cir. 2013) .....................................................................15

*Morchem Indus., Inc. v. Rockin Essentials LLC,*
    2021 WL 5014105 (S.D. Fla. June 16, 2021) ................................................29

*In re New York Skyline, Inc.,*
    432 B.R. 66 (Bankr. S.D.N.Y. 2010)...............................................................8

*Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.,*
    145 So. 3d 989 (Fla. Dist. Ct. App. 2014) .......................................................9

*Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.,*
    416 F. Supp. 3d 1369 (S.D. Fla. 2019) ..........................................................11

*Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.,*
    252 F.3d 1246 (11th Cir. 2001) .....................................................................28

*Park Place Cafe, Inc. v. Metro. Life Ins. Co.,*
    563 S.E. 2d 463 (Ga. Ct. App. 2002)..........................................................9, 24

*Parker v. Ahmsi Ins. Agency Inc.,*
    2019 WL 13178508 (S.D. Fla. Aug. 2, 2019)................................................25

*Parm v. Nat'l Bank of Cal., N.A.*,
　242 F. Supp. 3d 1321 (N.D. Ga. 2017) .................................................................18

*Peack v. Polk Cnty. Sheriff's Off.*,
　2017 WL 445750 (M.D. Fla. Feb. 2, 2017) .............................................................1

*In re Phillip Watts Enterprises, Inc.*,
　186 B.R. 735 (Bankr. N.D. Fla. 1995).....................................................................6

*Ray v. Spirit Airlines*,
　767 F.3d 1220 (11th Cir. 2014) .......................................................................19, 21

*Ray v. Spirit Airlines, Inc.*,
　836 F.3d 1340 (11th Cir. 2016) .......................................................................17, 25

*Renaissance Ctr. Venture v. Lozovoj*,
　884 F. Supp. 1132 (E.D. Mich. 1995), *aff'd sub nom.* 95 F.3d 1153 (6th Cir.
　1996) ............................................................................................................8, 11, 24

*Richards v. Headley*,
　2021 WL 2784278 (M.D. Ala. July 2, 2021)...........................................................2

*Rose v. M/V Gulf Stream Falcon*,
　186 F.3d 1345 (11th Cir. 1999) ...............................................................................8

*Sagaan Devs. & Trading Ltd. v. Quail Cruises Ship Mgmt.*,
　2013 WL 2250793 (S.D. Fla. May 22, 2013) ........................................................30

*Simpson v. Cardoso*,
　2021 WL 8939519 (S.D. Fla. Mar. 8, 2021)...............................................16, 24, 25

*Singing River Mall Co. v. Mark Fields, Inc.*,
　599 So. 2d 938 (Miss. 1992)....................................................................................9

*Sivak v. UPS Co.*,
　28 F. Supp. 3d 701 (E.D. Mich. 2014)..................................................................22

*Slater v. Energy Services Group Intern., Inc.*,
　634 F.3d 1326 (11th Cir. 2011) ...............................................................................5

*Smith v. Bank of Am. Home Loans*,
　968 F. Supp. 2d 1159 (M.D. Fla. 2013).................................................................21

*Sorota v. Belmat, Inc.*,
　819 So. 2d 975 (Fla. Dist. Ct. App. 2002) ..............................................................6

*Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*,
　534 F. Supp. 2d 1326 (S.D. Fla. 2008) ............................................................21, 25

*United States v. Dunning,*
    743 F. App'x 261 (11th Cir. 2018) ...........................................................................7

*Vital Pharms., Inc. v. Balboa Cap. Corp.,*
    2016 WL 4479370 (S.D. Fla. Aug. 25, 2016) ........................................................32

*Youngblood-West v. Aflac Inc.,*
    796 F. App'x 985 (11th Cir. 2019) ...........................................................26, 27, 28

*Zehm v. Morgan Properties,*
    2017 WL 4876783 (D.N.J. Oct. 27, 2017)...............................................................9

**Statutes**

18 U.S.C. § 1961 ..............................................................................................16, 21

18 U.S.C. § 1962 ......................................................................................16, 25, 26

Florida Deceptive and Unfair Trade Practices Act ............................................28

**Other Authorities**

Fed. R. Civ. P. 11 .................................................................................................2

Fed. R. Civ. P. 56 ...................................................................................... *passim*

## PRELIMINARY STATEMENT

In May of last year, this Court heard oral argument for more than two hours on whether Plaintiff's Amended Complaint ("FAC") alleged facts sufficient to survive a Motion to Dismiss. The parties, of course, disagreed vehemently on this issue. But Plaintiff's counsel offered this Court a proposal: "Let's get some discovery, let's see who is right. I'm pretty sure we are." Fifteen months later, we have finally reached the "put up or shut up" moment of this case. *Peack v. Polk Cnty. Sheriff's Off.*, 2017 WL 445750, at *7 (M.D. Fla. Feb. 2, 2017). With nearly three million pages of documents and deposition testimony from more than 30 witnesses, Plaintiff must now put forward admissible evidence proving what it alleged in the most slanderous terms: that "for the past 15 years," Defendants and non-party Valquest have engaged in a nationwide, "criminal" racketeering enterprise to inflate electrical charges for thousands of tenants across the country.

Now that discovery has concluded, the undisputed facts prove what Defendants have maintained from the beginning: there was no scheme to overcharge tenants for electricity. The origin of the alleged scheme, its participants, its purpose, its scope, its duration, its execution, its effects—these key elements are not only entirely unproven; they are entirely *disproven*. Every witness in the case, from Simon to Valquest, denied Plaintiff's allegations. Plaintiff itself has no facts or knowledge at all—its allegations came from counsel. Defendants' expert, a computer programmer and electrical engineer, analyzed more than 14,000 electricity estimates prepared by Valquest, as well as the source code underlying Valquest's computer system, and found no evidence of inflation. That finding is unrebutted. And Plaintiff's damages expert admitted that his damages calculations are untethered to the (unproven) theory of inflation proffered by Plaintiff's liability expert, whose opinions Plaintiff tellingly omitted from its recent class certification motion following key admissions at his deposition that undermined Plaintiff's case.

This case is and has always been meritless. Plaintiff's allegations were not the product of a good-faith investigation into the viability of its claims, but instead were lifted wholesale from an unrelated complaint filed in a separate lawsuit against a different landlord involving different facts (the "*CBL*" case)—hence the reason for Defendants' Rule 11 Motion (ECF No. 152). Having obtained a $90 million settlement against CBL, some of the same attorneys took a gamble, reviving an administratively dissolved gelato shop that had defaulted under its lease and filing a verbatim copy of the *CBL* complaint against Simon—an S&P 100 company and one of the largest real estate investment trusts in the world—with the hope of hitting an even bigger payday. Despite its onerous, multi-year fishing expedition, Plaintiff cannot muster any evidence that would raise a genuine issue of material fact to support its allegations, nor can Plaintiff refute the fact that it vacated its 408-square-foot premises in breach of its lease owing more than $300,000 in unpaid rent. Defendants, therefore, are entitled to summary judgment on all six claims in the FAC, as well as the Trust's breach of contract counterclaim.

## ARGUMENT

### A.  Legal Standard on a Motion for Summary Judgment.

"Summary judgment is appropriate where the moving party demonstrates through pleadings, interrogatories, and admissions on file, together with the affidavits, if any, 'that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Baker v. Russell Corp.*, 372 F. App'x 917, 919 (11th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). Once a properly supported motion is made, the nonmoving party must set forth specific facts of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). It is axiomatic that where the plaintiff is the nonmoving party, it may not recast the scope of its complaint to "assert a new theory of liability at the summary judgment stage." *Cabrera v. Macy's Fla. Stores, LLC*, 2022 WL 1642762, at *2 n.2 (S.D. Fla. Mar. 31, 2022); *see also Richards v.*

*Headley*, 2021 WL 2784278, at *3 (M.D. Ala. July 2, 2021) (plaintiff cannot "'move the goalposts' by substituting an entirely new factual predicate for [its] claims at the summary judgment stage"). A party asserting a fact as genuinely disputed must cite the record and cannot defeat summary judgment by presenting a mere scintilla of evidence or speculation or conjecture. *Baker*, 372 F. App'x at 919. Here, Plaintiff fails to present any evidence sufficient to avoid summary judgment.

**B.   Plaintiff's Breach of Contract Claim Fails as a Matter of Law.**

**1.   Section 7.1 Overview.**

Plaintiff's breach of contract claim is based on Section 7.1 of its lease (the "Lease") with The Town Center at Boca Raton Trust (the "Trust"). Section 7.1 governs Plaintiff's obligation to pay the Trust for electrical service as a form of additional rent. It states, in relevant part, as follows:

> Landlord may make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and *pay Landlord for the electrical service (based upon Landlord's determination from time to time of Tenant's consumption of electricity), as additional rent*, on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date *at the same cost as would be charged to Tenant from time to time by the utility company* which otherwise would furnish such services to the Premises *if it provided such services and metered the same directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service*.

(SMF ¶ 5[1] (emphasis added).) The plain meaning of this language can be broken into five parts: (1) Landlord "may make electrical service available" to the Leased Premises; (2) if Landlord does so, then Tenant agrees to "pay" Landlord for that service as a form of "additional rent"; (3) Tenant's additional rent payment will be "based on Landlord's determination from time to time of Tenant's consumption of electricity"; (4) Landlord will charge Tenant for electricity based on Landlord's determination of Tenant's consumption "at the *same cost* as would be *charged to*

---

[1] As used herein, "SMF" refers to Defendants' Statement of Material Facts. "JSF" refers to the parties' Joint Statement of Undisputed Facts.

_Tenant_ from time to time by the utility company which otherwise would furnish such services to the Premises"; _but_ (5) "in no event at a cost which is _less than_ the cost Landlord must pay in providing such electrical service."

Applied here, Plaintiff and the Trust agreed in Section 7.1 that the Trust was authorized to "determine" Plaintiff's consumption of electricity via any reasonable method of the Trust's choosing. The method chosen by the Trust was a Field Verified Study ("FVS") performed by Valquest. (SMF ¶¶ 13-14.) The FVS process begins with a tenant-specific form that a Valquest technician fills out during an in-person visit to a tenant's premises. (_Id._ ¶ 16.) During that visit, the technician interviews store personnel about the tenant's operating hours and its use of various equipment, and then conducts an audit of the space to identify and record numerous datapoints about the tenant's particularized electricity operations, such as its lighting, equipment, heating, and cooling. (_Id._) The resulting data is then inputted into Valquest's proprietary computer system to generate monthly estimates of that tenant's electricity consumption (measured in kilowatt hours ("kWh")) and demand (measured in kilowatts ("kw")). (_Id._)

Once the Trust received Plaintiff's estimated electricity consumption and demand from Valquest, it applied the electric rate that Florida Power & Light ("FP&L")—the utility company serving the Town Center at Boca Raton ("TCBR")—would have applied if it serviced Plaintiff's leased premises directly. (_Id._ ¶ 37.) In accordance with Section 7.1 of the Lease, if the cost that would be charged to Plaintiff by FP&L was equal to or greater than the Trust's cost, then the Trust applied the former to charge Plaintiff additional rent for electrical service provided to the Leased Premises. (_Id._ ¶ 36.) If the cost that would be charged to Plaintiff by FP&L was "less than" the Trust's cost, then the Trust applied the Trust's costs. (_Id._) Simply stated, Plaintiff was obligated to pay the greater of (i) the cost that would be charged to the Plaintiff by FP&L if it furnished

4

electrical service to the Leased Premises or (ii) the Trust's cost. This reading is straightforward, self-evident, and confirmed by undisputed extrinsic evidence.

Plaintiff, however, advances a tortured reading of Section 7.1, claiming that it required the Trust, under all circumstances, to charge Plaintiff for electrical service based on Plaintiff's "*actual usage*" of electricity (rather than an estimate) at the same cost that *the Trust* paid for electricity (rather than the cost Plaintiff would have been charged by FP&L). (FAC ¶ 148; ECF No. 195 at 4-5.) This reading is irreconcilable with the plain language of Section 7.1, which does not impose an "actual usage" requirement or otherwise state that "landlord's cost" must be applied in all circumstances. Thus, because Plaintiff's argument is foreclosed by the plain language of Section 7.1, Plaintiff's breach of contract claim should be dismissed as a matter of law.

## 2. The Language of Section 7.1 Is Unambiguous.

According to Plaintiff, the Trust breached Section 7.1 of the Lease by (1) charging Plaintiff "amounts in excess of what the Trust actually paid the local electric utility for the same electricity" (*see* FAC ¶ 148), and (2) charging Plaintiff "for more kWh" than Plaintiff "actually use[d]" (*see* ECF No. 195 at 4-5). These arguments are foreclosed by the plain language of Section 7.1.

### a. Section 7.1 Must Be Analyzed According to Its Plain Meaning.

A lease is subject to the same rules of interpretation as any other agreement. *See Julian Depot Miami, LLC v. Home Depot U.S.A., Inc.*, 364 F. Supp. 3d 1354, 1359 (S.D. Fla. 2018) (collecting cases). "[T]he plain meaning of a contract's language governs its interpretation." *Slater v. Energy Services Group Intern., Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011). "It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V Gulf Stream Falcon*, 186 F.3d 1345, 1350 (11th Cir. 1999). A contractual ambiguity "does not exist simply because the parties urge different interpretations of a contract's terms." *Bridge Capital Inv'rs, II v. Susquehanna*

*Radio Corp.*, 458 F.3d 1212, 1220 (11th Cir. 2006). In short, "[w]here contracts are clear and unambiguous, they should be construed as written, and the court can give it no other meaning." *Inst. & Supermarket Equip., Inc. v. C & S Refrigeration*, 609 So. 2d 66, 68 (Fla. App. 4 Dist. 1992).

        b.      <u>Section 7.1 Does Not Contain an "Actual Usage" Requirement.</u>

Plaintiff first argues that the Trust breached Section 7.1 by charging Plaintiff for more kWh than Plaintiff "actually use[d]." (ECF No. 195 at 4-5.) As an initial matter, this argument rests on an inherently flawed premise, as Plaintiff conceded that it does not know how much electricity it actually used during its tenancy—which, of course, is unknowable in the absence of a meter. (SMF ¶¶ 34-35.) Regardless, Plaintiff's "actual usage" argument runs contrary to the plain language of Section 7.1, which does not reference or imply an "actual usage" requirement. Rather, Section 7.1 gave *the Trust* the authority to "determin[e]" Plaintiff's "electrical consumption from time to time." Under Florida law, the "determination" of a tenant's electricity consumption is just that—a determination; it does not imply an obligation to charge a tenant for its "actual usage" of electricity. *See Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.*, 915 So. 2d 220, 223 (Fla. Dist. Ct. App. 2005) (reversing decision to calculate tenant's common area costs based on tenant's "actual usage" rather than "the formula found in the lease"); *cf. Sorota v. Belmat, Inc.*, 819 So. 2d 975, 976 (Fla. Dist. Ct. App. 2002) (landlord required to base tenant's electric charges on "actual use" because the lease utilized the term "pro-rata share," indicating "the drafters intended that the tenant pay only for those utilities it actually used"). Indeed, the absence of an "actual usage" requirement evidences an "intention to exclude" the term. *See In re Phillip Watts Enterprises, Inc.*, 186 B.R. 735, 740 (Bankr. N.D. Fla. 1995) (absence of lease provision requiring tenant "to pay its proportionate share of [common area] fees . . . is evidence of an intention to exclude it").[2]

---

[2] This reading is consistent with custom and practice in the retail real estate industry as well, which holds that unless the lease states otherwise, the landlord retains discretion in determining the manner in which the tenant's usage is

Here, as contemplated by Section 7.1, the Trust made electrical service available to Plaintiff's premises. In doing so, the Trust "determined" that Plaintiff's "electrical consumption" would be based on an FVS estimate—a customary and widely accepted method for determining tenants' electrical consumption. *See* Myron Kove & Alvin L. Arnold, *Escalation rental—Adjustment for increased operating expenses—Additional rent payments for electricity*, 1 REAL ESTATE TRANSACTIONS: STRUCTURE AND ANALYSIS WITH FORMS § 18:69 (2022) (hereinafter "Kove & Arnold") ("[U]sage is estimated rather than measured, based on a survey taken by the landlord at periodic intervals."). Consistent with industry practice, that usage estimate remained in place throughout the duration of Plaintiff's tenancy. (SMF ¶ 29.) *See* Mark A. Senn, *Commercial Real Estate Leases: Preparation, Negotiation, and Forms* § 9.05 (6th ed. 2022) (describing how a tenant's electricity "cost is not affected by [the tenant's] reduced usage unless a new survey is done."). Thus, because Section 7.1 clearly permitted the Trust to determine Plaintiff's electrical consumption via a method of its choosing, and because Section 7.1 does not contain an actual usage requirement, Plaintiff's argument to the contrary should be rejected as a matter of law.

  c. <u>Section 7.1 Allowed the Trust to Charge for Electrical Service "At the Same Cost" That the Utility Company Would Have Charged.</u>

In real estate parlance, Plaintiff's Lease is known as a "triple net lease," meaning the tenant (Plaintiff) rather than the landlord (the Trust) was required to pay for all costs associated with its tenancy as set forth in the lease, including real estate taxes, insurance, and utilities.[3] (SMF ¶ 11.) Consistent with that structure, Section 7.1 provides that Plaintiff was obligated to pay for electrical service to the Leased Premises, as additional rent, "at the same cost as would be charged to Tenant

---

calculated. (SMF ¶ 93); *see also* Michael Zwang, *Electricity: Controlling Tenant Costs*, 35 MORTGAGE & REAL ESTATE EXECUTIVES REPORT 7 (2003) ("The electrical charge . . . may or may not reflect actual usage or even the rates paid by the landlord and is clearly a negotiated item.").

[3] Florida federal and state courts regularly analyze triple net leases. *See, e.g.*, *United States v. Dunning*, 743 F. App'x 261, 266 (11th Cir. 2018); *Hochhauser v. Jacobson*, 795 So. 2d 232, 234 n.1 (Fla. Dist. Ct. App. 2001) ("Under a triple net lease, the tenant is obligated to pay all taxes, insurance and cost of maintenance on the leased premises.").

from time to time by the utility company . . . but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service." In plain terms, this means that the Trust was permitted to charge either "Tenant's cost" (*i.e.*, what the Tenant would have been charged if it received electricity from the utility directly) or "Landlord's cost," whichever is greater. In other words, contrary to Plaintiff's allegation, Section 7.1 did *not* require the Trust to charge "Landlord's cost" for electrical service in all circumstances; rather, Section 7.1 gave the Trust the *ability* to charge Landlord's cost in the "event" its cost exceeded Plaintiff's cost—the very purpose of a triple net lease. *See Double Park, LLC v. Kaine Parking 125, LLC*, 168 So. 3d 278, 281 (Fla. Dist. Ct. App. 2015). There is no other way to read Section 7.1 without rendering the provision entirely useless. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir. 1997) ("[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable.").

Other courts have reached the same conclusion. For example, in *Compton Advertising, Inc. v. Madison-59th Street Corp.*, the plaintiff-tenant argued that its landlord was prohibited from invoking a similar clause in the parties' lease because doing so resulted in the landlord earning an unlawful profit on electricity. 398 N.Y.S.2d 607 (N.Y. Sup. Ct. 1977). The court rejected that argument, concluding that the tenant's electrical costs were "subject to variations upward or downward" based upon "increases or decreases in [the utility company's] charges to the landlord." *Id.* at 772; *see also In re New York Skyline, Inc.*, 432 B.R. 66, 86 (Bankr. S.D.N.Y. 2010) (granting summary judgment where nothing in the lease "prevent[ed] [the landlord] from charging its tenants more than it pays" for electricity); *Renaissance Ctr. Venture v. Lozovoj*, 884 F. Supp. 1132, 1142 (E.D. Mich. 1995)*, aff'd sub nom.* 95 F.3d 1153 (6th Cir. 1996) ("RCV charged tenants for electricity at the secondary rate, the exact same rate which would have applied had the tenants

purchased their electricity from [the utility company] directly."); *Singing River Mall Co. v. Mark Fields, Inc.*, 599 So. 2d 938, 941 (Miss. 1992) ("[T]he lease called for the mall to charge the tenant the same rate it would have paid the utility company directly.").[4] The Florida Bar endorses this reading as well. *See* MICHAEL D. KATZ & ERICA L. ENGLISH, *Shopping Centers, Office Buildings, and Mixed-Use Properties*, *in* FLORIDA REAL PROPERTY COMPLEX TRANSACTIONS § 2 (The Fl. Bar Cont. Legal Educ. 10th ed. 2021) (describing how shopping mall landlords "can and often [do]" profit from the redistribution of electricity to tenants by (among other things) "computing the charge at the consumer rate rather than the bulk rate paid by the landlord").

In short, based on an objective reading of Section 7.1, the Trust was plainly permitted to charge Plaintiff for electrical service at the same cost that FP&L would have charged Plaintiff if it furnished electrical service to the Leased Premises directly; the Trust was not obligated to charge "Landlord's cost" in all circumstances. Thus, because Plaintiff's breach of contract claim runs contrary to the plain and unambiguous meaning of Section 7.1, it should be dismissed as a matter of law. *See Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. Dist. Ct. App. 2014) ("Contracts are voluntary undertakings, and contracting parties are free to bargain for—and specify—the terms and conditions of their agreement. That freedom is indeed a constitutionally protected right. It is not the province of a court to second guess the wisdom of their bargain, or to relieve either party from the burden of that bargain by rewriting the document. Rather, it is a court's duty to enforce the contract as plainly written.") (cleaned up).

---

[4] *See also Park Place Cafe, Inc. v. Metro. Life Ins. Co.*, 563 S.E. 2d 463, 466 (Ga. Ct. App. 2002) ("[T]he fact that electricity might not be billed to appellants at the landlord's actual cost was a matter specifically addressed by the leases."); *Glenwood Shopping Ctr. Ltd. P'ship v. K Mart Corp.*, 356 N.W.2d 281, 285 (Mich. Ct. App. 1984) (same) *Zehm v. Morgan Properties*, 2017 WL 4876783, at *10 (D.N.J. Oct. 27, 2017) (same); *Accurate Copy Service of Am., Inc. v. Fisk Bldg. Assocs. LLC*, 2009 WL 1401179 (N.Y. Sup. Ct. May 12, 2009) (same); *Adams, Stevens & Bradley v. Empire State Bldg. Co. L.L.C.*, 2009 WL 5225175 (N.Y. Sup. Ct. Dec. 23, 2009) (same).

d.      Extrinsic Evidence Supports the Trust's Interpretation.

"Florida law allows courts to consider extrinsic evidence of course of performance, course of dealing, or usage of trade to explain or supplement a contract's terms, even when those terms are not ambiguous, as long as the evidence is not used to contradict the contract's terms." *Apple Glen Invs., L.P. v. Express Scripts, Inc.*, 700 F. App'x at 939 (11th Cir. 2017) (collecting cases). Here, extrinsic evidence not only confirms that the plain language reading set forth above is the one agreed to by the parties, but it also confirms that Defendants did not "fraudulently overstate" Plaintiff's electrical consumption (*see* ECF No. 147 at 9):

- The owner of Café Gelato, Julian Mancinelli, negotiated and signed *three separate leases* with the Trust—one on behalf of a different store ("Maggio & Rossetto") in 2002, and two on behalf of Café Gelato with the assistance of counsel: one in 2009 and another in 2014. (*Id*. ¶¶ 1-6, 15.) The Trust determined electrical consumption for both Maggio & Rossetto and Café Gelato via an FVS, and both of the Café Gelato leases had the same language in Section 7.1 related to electrical service. (*Id*. ¶¶ 13-15). Thus, *for roughly 15 years*, Mr. Mancinelli paid additional rent for electrical service based on a Valquest FVS at the same cost FP&L would have charged his business if it serviced the premises directly.

- Plaintiff requested, received, and reviewed a copy of its FVS in 2011, and thus knew that its electricity consumption was based on an estimate, not actual usage. (*Id*. ¶¶ 13, 17, 34.)

- Plaintiff received an electricity report (called a "Charge Backup Report") on an annual basis that disclosed the FP&L rate applied by the Trust (the "General Service Rate") and further provided detailed information regarding Plaintiff's electric charges (including its monthly kWh consumption), and Plaintiff acknowledged that it could have used this information to verify its electricity charge. (*Id*. ¶ 20, 33.)

- FP&L's rates are a matter of public record and nothing prevented Plaintiff from contacting FP&L and learning about its rates. (*Id*. ¶ 33.)

- The plain language of Section 7.1 is consistent with testimony from each of the employees in Simon's Utility Billing Department who were asked about its meaning. (*Id*. ¶ 36.)

- Defendants' utility rate expert, Dr. Agustin Ros, submitted an unrebutted report confirming the Trust applied the correct rate for Café Gelato's electrical service. (*Id*. ¶ 37.)

- Every witness from Simon and Valquest testified that the FVSs were intended to be as accurate as possible; no fact witness testified to the contrary. (SMF ¶¶ 38.)

- Defendants' leasing expert, Andrew Shedlin, submitted an unrebutted expert report confirming that the language in Section 7.1 is common and widely accepted in the retail real estate industry. (*Id*. ¶ 92.)

Because extrinsic evidence supports a plain reading of Section 7.1, dismissal is required.[5]

### 3. Plaintiff's Breach of Contract Claim Should Be Dismissed for Failure to Provide Notice of Default and for Failure to Object.

Setting the plain language analysis of Section 7.1 aside, the Trust is also entitled to summary judgment on Plaintiff's breach of contract claim for two additional, independent reasons. First, Plaintiff's breach of contract claim should be dismissed as a matter of law because Plaintiff failed to comply with Section 19.1 of the Lease, which states that the Trust "shall in no event be charged with default in any of its obligations" under the Lease *unless* Plaintiff gives "written notice" of any such default and affords the Trust 30 days to cure. (*Id*. ¶ 44.) It is hornbook law that "when a default clause contains a notice provision, it must be strictly followed, and summary judgment is warranted if notice is not given." *In re Colony Square Co.*, 843 F.2d 479, 481 (11th Cir. 1988); *see also Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1376 (S.D. Fla. 2019). Here, it is undisputed that Plaintiff never provided written notice to the Trust as required by Section 19.1. (SMF ¶ 45.) As such, Plaintiff's claim fails. *See, e.g.*, *Kurian v. Wells Fargo Bank, Nat. Ass'n*, 114 So. 3d 1052, 1055 (Fla. Dist. Ct. App. 2013); *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 290 (Fla. Dist. Ct. App. 2007).

Second, Plaintiff failed to comply with Section 24.10 of the Lease, titled "Objection to Statements." Section 24.10 provides that the "failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute

---

[5] Even if this Court finds that there are two ways to read Section 7.1 (which the Trust does not concede), it is axiomatic that "tak[ing] different interpretations under a contract . . . does not give rise to fraud." *See Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir. 1987) (collecting cases); *see also Renaissance*, 884 F. Supp. at 1146 ("The gravamen of plaintiffs' complaint is that electric rates were not computed as allegedly required by the lease agreement. This charge does not state a fraud claim.").

Tenant's acquiescence with respect thereto." (SMF ¶ 46.) Because the record shows without contradiction that Plaintiff did not object to any Trust invoice or bill after it signed its Lease in 2014—a failure all the more notable given that Plaintiff was told in 2011 that any objections to its electrical charges needed to be submitted in writing (*id.* ¶ 47)—Plaintiff waived its right to sue for breach of contract. *See 3455 LLC v. ND Properties, Inc.*, 2014 WL 3845696, at *6 (N.D. Ga. Aug. 5, 2014) (granting summary judgment to landlord because tenant "waived any right" to bring a claim "[b]y failing to give notice" prior to bringing suit).[6]

**C.    Plaintiff's Federal and Florida RICO Claims Fail as a Matter of Law.[7]**

**1.    The Undisputed Record Disproves Plaintiff's RICO Allegations.**

Plaintiff's RICO claim rests on its allegation that "for the past 15 years," Defendants and Valquest have engaged in a RICO conspiracy to overcharge tenants for electricity "at all of its shopping malls throughout the United States." (FAC ¶ 1.) Plaintiff traces the origin of this conspiracy back to the "second quarter of 2005," when Valquest's then-President, Phil Catagnus,[8] "met with executives from Simon" and presented them with "a PowerPoint entitled Optimizing Income From Utilities" that explained how Simon could unlawfully "earn income by re-selling electricity to tenants." (*Id.* ¶ 35.) Plaintiff contends that as set forth in the PowerPoint, the scheme first "required that Simon's tenants' electric charges be based on surveys prepared by Valquest." (*Id.*) Once Simon arranged for Valquest to conduct a survey, Valquest would then "over-estimate[]

---

[6] In Count VI, Plaintiff alleges that the Trust breached the implied covenant of good faith and fair dealing by charging Plaintiff for electrical service in "amounts greater than what the Trust actually paid for electricity." (FAC ¶ 157.) Like Plaintiff's breach of contract claim, this argument fails as a matter of law because it runs contrary to the express terms of Section 7.1. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999) ("[A] cause of action for breach of the implied covenant cannot be maintained (a) in derogation of the express terms of the underlying contract or (b) in the absence of breach of an express term of the underlying contract.").

[7] Because interpretation of Florida's RICO laws is informed by decisions interpreting the federal RICO statute, the two claims are addressed together. *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004). To the extent Florida law differs from § 1962, those differences are addressed specifically herein.

[8] Mr. Catagnus passed away in 2018, before Plaintiff filed this case.

the tenants' annual kilowatt hour usage and, based on that consumption, assign[] a kilowatt hour rate that was higher than what the mall paid for that same kilowatt hour of electricity." (*Id.*) From there, "Valquest would . . . multiply the tenant's inflated kilowatt hour usage by the marked-up electric rate, resulting in the inflated electric charge that Simon would bill its tenants." (*Id.*) According to Plaintiff, "[t]he Simon executives agreed" with the "electric re-sale scheme proposed by Valquest" and, "shortly after" the meeting, "Simon entered into an agreement and an association-in-fact enterprise with Valquest and directed Valquest to artificially inflate the amount of the electricity costs in the energy surveys provided to the tenants that rented space at malls that were owned by Simon through its holding companies." (*Id.* ¶ 36.) Plaintiff further alleges that Defendants "directly profited from the illegal conduct by knowingly and intentionally marking up Cafe Gelato's electricity charges and also by causing M.S. Management to knowingly and intentionally mark-up Cafe Gelato's electrical charges"—resulting in Plaintiff paying "fraudulent invoices" at least "25" times "over a three-year period" from "October 2014 through January 2017." (*Id.* ¶¶ 37, 47) And once the scheme was in place, Plaintiff avers that Defendants "used the profits from its illegal electricity scheme" to (1) "purchase, invest in, and operate additional shopping centers where [they] directed Valquest to put new tenants on inflated electric surveys" and (2) "co[n]vert malls . . . from individually metered to master metered malls where they could, through the use of Valquest surveys, mark-up their tenants' electric charges." (*Id.* ¶ 48.)

Despite the seeming specificity of these allegations, discovery has revealed that they are completely and utterly false. This is not a matter of hyperbole. Valquest never presented "a PowerPoint entitled Optimizing Income From Utilities" to "Simon executives" in "the second quarter of 2005" (or, for that matter, at any other time); indeed, there never was such a meeting. (SMF ¶¶ 57-59.) Instead, this allegation was lifted from the *CBL* case, where the plaintiff alleged

that Valquest "la[id] out in [a] PowerPoint in April 2005 how overcharges could be tracked to avoid scrutiny."[9] Here, by contrast, the record is undisputed that Valquest began conducting FVSs for tenants in 2003, not 2005. (*Id*. ¶ 69.) The parties' relationship originated not with Phil Catagnus, but with Jim Reynolds, a former employee of non-party Simon Property Group Administrative Services Partnership, L.P. ("ASP") who began working with Valquest in 2003 and was solely responsible for overseeing the Simon account until his passing in 2021. (*Id*. ¶¶ 71-73.) The parties' services agreement was executed in 2007 by Simon Property Group, L.P. ("SPG, L.P.") on behalf of its "affiliated entities." (*Id*. ¶ 70.) And the services performed by Valquest under that contract were limited solely and exclusively to conducting FVSs for the purpose of generating electricity usage estimates; Valquest never "assigned a kilowatt hour rate" for putative class tenants as Plaintiff alleges, nor did it ever provide Simon with an "electric charge" that Defendants used to bill tenants. (*Id*. ¶¶ 74-77.) These allegations were likewise lifted from the *CBL* case, which—as Plaintiff learned during discovery—involved an "entirely different set of services" and "reports" than those provided by Valquest in this case. (*Id*. ¶ 75.)

Moreover, contrary to Plaintiff's allegation, it is undisputed that M.S. Management had no involvement with Café Gelato or tenants at TCBR. M.S. Management does not manage TCBR, is not involved in lease negotiations, and has never billed tenants for electricity. (*Id*. ¶¶ 49-53.) This fact disproves Plaintiff's core allegation that M.S. Management was the party responsible for "knowingly and intentionally mark[ing]-up [its] electrical charges." (FAC ¶ 37.) It is also undisputed that SPG, L.P. and Simon Property Group, Inc. ("SPG, Inc.") do not have any employees and do not communicate or otherwise interact with tenants or vendors like Valquest, and thus, by definition, could not have played a role in the alleged scheme. (SMF ¶¶ 54-56, 83-

---

[9] This representation was contained in a sealed filing in *CBL* (*See* Case No. 2:16-cv-00206, ECF No. 181 at 12.)

86.) Additionally, it is undisputed that Defendants did not use the "profits" from this alleged scheme to (1) "purchase, invest in, and operate additional shopping centers" or (2) "convert malls" from "individually metered to master metered" facilities. In fact, the number of malls at which Valquest performed FVSs has *decreased nearly 20%* over the years. (*Id*. ¶ 80.) The clearest example of this is at Firewheel Town Center in Garland, Texas, where former class representative, Pete's Burgers, is a tenant.[10] As Defendants informed Plaintiff nearly two years ago, Valquest stopped performing services at Firewheel in 2007 after the mall installed *submeters* to measure tenants' electricity usage, including for Pete's Burgers (which, of course, meant that Pete's Burgers was not a member of the class it sought to represent). (*Id*. ¶¶ 81-82.) Numerous other properties underwent similar changes. (*Id*. ¶ 80.) This fact alone invalidates the stated "purpose" of the alleged conspiracy, which, according to Plaintiff, was to *increase* the number of tenants whose electricity was determined by Valquest.

In short, Plaintiff cannot point to a single fact—literally, not one—to support the RICO allegations set forth in the Amended Complaint. When did the scheme originate? What was the purpose of the scheme? What role did each Defendant play in the scheme? How was Plaintiff harmed by the scheme? How did the alleged co-conspirators benefit from the scheme? These questions are all entirely unanswerable.[11] As a result, Plaintiff cannot prove the elements of a cognizable RICO claim; it cannot show a scheme to defraud under the mail and wire statutes, it cannot prove a pattern of racketeering activity, and it cannot show the existence of an enterprise. Count I, therefore, should be dismissed as a matter of law.

---

[10] Pete's Burgers dismissed its claims on Saturday, April 9, 2022, just one business day before Defendants' deadline for filing its Answer and Counterclaims. (ECF No. 150.)

[11] To the extent Plaintiff attempts to change its RICO theory, Plaintiff is the master of its complaint and may not amend its complaint through argument; thus, the Court may not "simply ignore the allegations in the complaint." *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013); *see also Richards*, 2021 WL 2784278, at *3 (plaintiff cannot "'move the goalposts' by substituting an entirely new factual predicate for [its] claims at the summary judgment stage").

## 2.    Plaintiff Cannot Establish a Cognizable RICO Claim.

Turning to the legal requirements of RICO, Plaintiff alleges that Defendants violated three sections of the RICO statute by conspiring with Valquest as described above. First, Plaintiff claims that Defendants formed an association-in-fact enterprise with Valquest and violated 18 U.S.C. § 1962(c) through a pattern of racketeering activity involving the use of interstate mail and wires to fraudulently execute the "scheme" to inflate tenants' electrical charges. (FAC ¶¶ 106, 108, 137-39.) Second, Plaintiff contends that Defendants violated § 1962(a) by investing the income from their racketeering activity into the enterprise. (*Id.* ¶¶ 118-19, 141-42.) Third, Plaintiff alleges that Defendants violated § 1962(d) by conspiring to violate § 1962(a) and (c). (*Id.* ¶ 121.)

As the alleged violations of § 1962(a) and (d) flow from the alleged violation of § 1962(c), this Court's RICO analysis may begin and end with § 1962(c). To prove a RICO violation under § 1962(c), Plaintiff must prove that Defendants "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Simpson v. Cardoso*, 2021 WL 8939519, at *4 (S.D. Fla. Mar. 8, 2021) (quoting *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020)). As described above, discovery has shown that Plaintiff cannot prove the alleged scheme to defraud. And under the strict requirements of RICO, Plaintiff's claim fails for four additional reasons. First, Plaintiff cannot prove the existence of an "enterprise." Second, Plaintiff cannot prove a "pattern of racketeering activity" or causation. Third, Plaintiff cannot prove conspiracy or investment injury. Fourth, the claim is time-barred.

### a.    Plaintiff Cannot Prove the Existence of a RICO "Enterprise."

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Plaintiff alleges that Defendants, Valquest, and

"other unnamed" and/or "unidentified" co-conspirators formed an "association-in-fact" enterprise to carry out their unlawful scheme. (FAC ¶¶ 106, 110.) To prove the existence of an "association-in-fact enterprise," Plaintiff must establish three "structural features": "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009)). Because Plaintiff cannot prove any of these structural features, it cannot prove an enterprise.

                    i.    Plaintiff Cannot Prove a "Common Purpose."

Plaintiff's RICO claim fails at the outset because it cannot prove that the named Defendants and Valquest shared a "common purpose"—the first structural feature of a RICO enterprise. *Id.* at 1067. The focus here is on whether the purpose was carried out "collectively," *i.e.*, whether each of the alleged co-conspirators pursued "a particular criminal course of conduct" for the "shared" purpose of collective enrichment. *Cisneros*, 972 F.3d at 1211-12. "An abstract common purpose, such as a generally shared interest in making money, will not suffice." *Id.* at 1211 (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352-53 & n.3 (11th Cir. 2016)). Instead, Plaintiff must point to "concrete facts" showing precisely how the enterprise's participants pursued a common purpose to defraud, identifying with particularity the "origin" and "scope" of the scheme as well as the "specific interactions" carried out in furtherance thereof. *Id.* at 1212.

As described above, Plaintiff has no evidence supporting its allegation that the scheme formed during "the second quarter of 2005" when Valquest presented a PowerPoint to unidentified "Simon executives" explaining how Defendants could "earn income by re-selling electricity to tenants at its malls." (FAC ¶¶ 35-36.) The takeaway from the undisputed facts is clear: There is no proof of "specific interactions" between each (or any) Defendant and Valquest corroborating the "resale scheme" alleged in the FAC, nor is there any proof regarding the "origins or scope" of

17

that alleged scheme. *Cisneros*, 972 F.3d at 1213. Rather, as was the case in *Cisneros*, Plaintiff is asking this Court "to speculate that [Defendants] decided at some point to pursue fraud and that [Valquest was] involved in that decision." *Id.* This Court should "not indulge that speculation." *Id.* Stripped of the fictitious claims about a phantom PowerPoint presented at a fabricated meeting to nameless executives in 2005, Plaintiff's allegations amount to nothing more than a "routine contractual relationship for services as an independent enterprise" based on a contract that "say[s] nothing about an illicit enterprise or fraudulent scheme." *Flagg v. First Premier Bank*, 257 F. Supp. 3d 1351, 1356-59 (N.D. Ga. 2017); *Almanza*, 851 F.3d at 1073.[12] This is woefully deficient.

      ii.      The Lack of "Sufficient Relationships" for the Enterprise.

The second structural feature of a RICO enterprise requires "proving sufficient relationships for an associated-in-fact enterprise"—*i.e.*, that Defendants and Valquest "acted as a continuing *unit*, and not merely independently." *Almanza*, 851 F.3d at 1068. To that end, Plaintiff must prove that Defendants and Valquest "entered into an agreement, either express or tacit" to overcharge tenants for electricity, and that this "alleged agreement is itself an association in fact." *Id.* Plaintiff cannot do so. As shown, two of the Defendants, SPG, Inc. and SPG, L.P., have no employees and were not involved in charging tenants for electricity. (SMF ¶¶ 83-85.) And Valquest unequivocally testified that "there is no truth" to the allegation that it ever inflated electric charges for tenants or agreed with Defendants to do so. (*Id.* ¶ 79.) Plaintiff also lacks any evidentiary support for its allegation that Valquest was paid a "share of the proceeds of the scheme" or that Valquest's fees were somehow tied to the "profits" collected on inflated electricity invoices (*see* FAC ¶¶ 109, 111, 115, 119), "as opposed to simply being compensation for general business

---

[12] In a similar vein, merely carrying out one's own business initiatives—even if done fraudulently—also does not support a RICO enterprise. *See Acosta v. Campbell,* 2006 WL 146208, at *6 (M.D. Fla. Jan. 18, 2006) (regular business activities do not constitute "enterprise activities" under RICO); s*ee also Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1346-47 (N.D. Ga. 2017) (same).

services rendered." *Ray v. Spirit Airlines*, 767 F.3d 1220, 1227 (11th Cir. 2014); *Cisneros*, 972 F.3d at 1213 (no allegation co-conspirator "received any money in connection with the alleged scheme . . . other than what Cisneros directly paid it in exchange for her American Kennel Club registration"). In fact, under their contract, Valquest was paid a fixed fee for each FVS performed, irrespective of the results of that FVS, and those fees were paid by the individual landlord entities for each property—not by SPG, Inc., SPG, L.P., or M.S. Management. (SMF ¶ 78.) Moreover, there has even been a *reduction* in the use of Valquest's services since 2007, not an effort to "convert malls . . . from individually metered to master metered" as alleged by Plaintiff. (*Id.* ¶ 80.)

This Court should also not simply "infer an agreement—and thus an enterprise—from the parallel conduct of Defendants" and Valquest. *Almanza*, 851 F.3d at 1068. Here, Plaintiff's alleged "scheme" is devoid of proof of any "specific interactions" connecting Defendants and Valquest to the alleged scheme or otherwise indicating that they "decided on this purpose together." *Cisneros*, 972 F.3d at 1213. There is no proof that any of the Defendants "directed" Valquest to improperly inflate its usage surveys; that "all or even most" of the Valquest surveys were fraudulent; or that Defendants "knew" Valquest had inflated surveys. *Id.* (SMF ¶¶ 60-66, 79.)[13]

Because Plaintiff cannot establish the first two elements of an association-in-fact enterprise between Defendants and Valquest, it also cannot prove the third structural feature of RICO: longevity. Since there was no "agreement" or "meeting of the minds" among Defendants and Valquest to defraud tenants, there was never any enterprise that existed long enough to allow the "associates to pursue its purpose." *Boyle*, 556 U.S. at 948.

---

[13] Plaintiff's liability expert, Dr. Robert Frazier, relied on a dozen emails to support his opinion that Valquest inflated electricity estimates. Defendants urge this Court to review those emails. (SMF ¶ 145.) Two emails relate to non-class member malls; two emails relate to tenants with their own unique lease forms; one email discusses lease requirements; two emails relate to an innocuous discussion about the correct "diversity factor" for espresso machines; one email relates to a calculation parameter ("Added kW") proposed but never implemented by Valquest; and one email relates to the installation of LED lighting, which results in lower electricity usage. The suggestion that these 12 innocuous mails, which span a decade, provide the foundation for a nationwide RICO scheme is absurd.

           iii.      The Lack of Distinctiveness Among the Defendant Entities.

Without any proof that Valquest agreed to form an enterprise with any of the Defendants, Plaintiff is left with only the four Defendant entities and "unnamed co-conspirators." But this is not enough to prove an enterprise. Specifically, Plaintiff cannot show that each of the named Defendants "is separate and distinct from the other," or that each of them separately "participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1378 (S.D. Fla. 2010); *see also Coursen v. JP Morgan Chase & Co.*, 2013 WL 5437341, at *15 (M.D. Fla. Sept. 27, 2013) (granting summary judgment for failure to show distinctiveness). Instead, Plaintiff lumps the four Defendants together, claiming they "operate as one company with overlapping directors, management, and employees." (FAC ¶ 13.) Plaintiff cannot point to any evidence proving the specific ways in which each of these entities participated in the conduct of the enterprise to accomplish the overall objective of the enterprise. *See Astro Tel, Inc. v. Verizon Fla., LLC*, 979 F. Supp. 2d 1284, 1295-96 (M.D. Fla. 2013) (granting summary judgment where plaintiff failed to proffer "specific" facts showing how the defendants "engaged in" the alleged scheme); *Abrams v. Ciba Specialty Chemicals Corp.*, 663 F. Supp. 2d 1220, 1225 (S.D. Ala. 2009) (same).

First, there is no evidence supporting Plaintiff's allegation that "M.S. Management is responsible for managing Simon's shopping malls nationwide" or that it played any role in drafting the Lease. (FAC ¶¶ 2-3.) To the contrary, M.S. Management manages only one mall in the putative class of 50 malls (which is not TCBR) and is not involved in lease negotiations for any tenant at any mall.[14] (SMF ¶¶ 49-53.) Second, Plaintiff admitted under oath that it has never communicated with anyone from M.S. Management, SPG, Inc., or SPG, L.P.—either during lease negotiations or

---

[14] Indeed, for this reason, Plaintiff dropped any reference to M.S. Management from its most recent class definition.

anytime thereafter. (*Id*. ¶¶ 51-55.) Third, and relatedly, Plaintiff conceded at its deposition that it has no facts to support its allegation that these three entities had any involvement with charging tenants for electricity at TCBR. (*Id*. ¶¶ 54-56.) In fact, TCBR is owned and operated by the Trust— an entity that "cannot constitute a legal entity enterprise under RICO." *Abromats v. Abromats*, 2016 WL 4917153, at *12 (S.D. Fla. Sept. 15, 2016).[15] Thus, Plaintiff not only lacks evidence of an enterprise between Valquest and Defendants, but it also has no evidence of the "specific acts committed by each" of the Defendant entities in furtherance of any alleged scheme. *Abrams*, 663 F. Supp. 2d at 1225. As a result, it cannot establish an association-in-fact RICO enterprise.

        b.    <u>Plaintiff Cannot Prove a "Pattern of Racketeering Activity."</u>

Under RICO, a "pattern of racketeering activity" requires at least two "predicate acts" of racketeering activity. *Smith v. Bank of Am. Home Loans*, 968 F. Supp. 2d 1159, 1168-69 (M.D. Fla. 2013). "Racketeering activity" means violating the "criminal statutes listed in 18 U.S.C. § 1961(1), which includes wire fraud and mail fraud." *Id.* Plaintiff bases its RICO claim on alleged acts of mail and wire fraud (FAC ¶¶ 47, 108, 114-15), which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Kivisto v. Miller Canfield Paddock & Stone PLC*, 413 F. App'x 136, 139 (11th Cir. 2011). Critically, a "scheme to defraud" under the mail and wire fraud statutes requires intentional conduct and a "misrepresentation." *Braswell Wood Co. v. Waste Away Grp., Inc.*, 2010 WL 3168125, at *3 (M.D. Ala. Aug. 10, 2010); *see also Ray*, 767 F.3d at 1227; *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp 1326, 1339

---

[15] In denying Defendants' Motion to Dismiss, this Court cited *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378 (2016), for the proposition that "traditional trusts and business trusts, such as REITs, may be viewed differently with regards to their 'legal entity' status." (ECF No. 147 at 6 n.7.) However, *Americold* did not address a RICO claim; rather, it dealt with a Maryland-based trust and whether the citizenship of the trust's shareholders could be considered for jurisdictional purposes. *Id.* at 380. Here, there is no jurisdictional issue; instead, the question is whether a Florida-based trust qualifies as an "association-in-fact" for purposes of RICO. Under *Abromats*, the answer is clearly "no." *See Abromats*, 2016 WL 4917153, at *13 ("[A] Florida trust does not constitute a legal entity for RICO purposes.").

(S.D. Fla. 2008); *Beck-Ford Construction, LLC v. TCA Global Credit Master Fund, LP*, 2018 WL 11422985 (S.D. Fla. 2018).

i.      There Is No Proof of an Intentional Misrepresentation.

Plaintiff tries to prove a scheme to defraud via alleged intentional "misrepresentations" in the leases and invoices sent to Plaintiff and other tenants. In particular, Plaintiff claims the Lease misrepresented that Defendants "would not charge more for electricity than if [it] was purchased directly from the local public utility provider." (FAC ¶¶ 117, 120.) Plaintiff further alleges the "monthly invoices" and "energy audits" misrepresented that "these amounts were honestly owed," so that Plaintiff was led to "believ[e] that they accurately reflected the actual electric costs." (*Id.*) But discovery has shown that there were no misrepresentations in the Lease or the invoices, thus foreclosing Plaintiff's ability to establish RICO liability.

First, Plaintiff's Lease expressly vested the Trust with the authority to "determine" Plaintiff's electricity usage and charge Plaintiff for electrical service at the same cost that FP&L would have charged Plaintiff, but in no event at a cost less than the Trust's cost. (SMF ¶ 5.) To that end, and in accordance with the terms of the Lease, the Trust calculated Plaintiff's electrical service charge via the usage estimate set forth in the FVS—a copy of which Plaintiff asked for, received, and reviewed in 2011—based on the (publicly available) General Service Rate applicable under the FP&L tariff. (*Id.* ¶¶ 17, 20.) Moreover, the Charge Backup Reports that Plaintiff received annually showed the FP&L rate that the Trust used to calculate Plaintiff's monthly charge, as well as the kWh that Valquest estimated through the FVS. (*Id.* ¶¶ 20, 33.) And as set forth above, the Lease did not require Plaintiff to be charged the same rate that the Trust paid to FP&L. Thus, the alleged misrepresentation is at best a breach of contract. Under controlling case law, Plaintiff is not "permitted to alchemize [its] claims for breach of contract into ones for civil RICO conspiracy." *In re Checking Acct. Overdraft Litig.*, 797 F. Supp. 2d 1323, 1332 (S.D. Fla. 2011).

22

Plaintiff is also not permitted to proffer a self-serving misreading of the Lease to create a fraud where one does not exist. *See Sivak v. UPS Co.*, 28 F. Supp. 3d 701, 722 (E.D. Mich. 2014) (granting judgment on the pleadings where plaintiffs "[did] not allege any 'fraudulent conduct' outside of [their] own attempt to twist the contract's language into something that it [did] not say").

Further, there can be no misrepresentation where a contract permits (and here, requires) the alleged conduct. *See Braswell*, 2010 WL 3168125, at *4 (rejecting alleged misrepresentations in "mailed invoices, contracts, and letters" where contract permitted surcharges for increased costs in certain circumstances); *see also In re Checking*, 797 F. Supp. 2d at 1332 (fees authorized by contract). But even if the Trust incorrectly charged Plaintiff for electricity under the Lease (it did not), resulting in an "overcharge," that still would not constitute an actionable predicate act of fraud because "wrongful overcharges, . . . when permitted by contract, are not synonymous with the meaning of 'misrepresentation' in the context of the RICO statute." *Id.*

For the same reason that the Lease did not misrepresent what Plaintiff would be charged for electric service, the invoices likewise contained no misrepresentations as to the amounts due. The Trust billed Plaintiff the additional rent for electric service in compliance with the Lease, and the monthly invoices provided to Plaintiff expressly disclaimed that the estimates (*i.e.*, the FVS) used to calculate additional rent constituted material representations, stating:

> LANDLORD DOES NOT INTEND TO INDUCE TENANT TO RELY ON ANY ESTIMATES OR PROJECTIONS CONTAINED IN THIS DOCUMENT. **SUCH ESTIMATES SHOULD NOT BE CONSIDERED AS A MATERIAL REPRESENTATION, BUT SIMPLY LANDLORD'S APPROXIMATE ESTIMATION OF TENANT'S ADDITIONAL RENTAL OBLIGATIONS AND NOT AS A GUARANTEE AS TO THE ACTUAL AMOUNT OF TENANT'S RENTAL OBLIGATIONS THAT ARE OR MAY BECOME DUE UNDER THE LEASE**.

(SMF ¶ 88.) The invoices, in other words, make clear that Plaintiff's electrical charges were based on "Landlord's approximate estimation" of Plaintiff's additional rent payment (including for

electric service) as permitted under the Lease. This plainly does not constitute a misrepresentation under the mail and wire fraud statutes. *See Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1194 (S.D. Fla. 2021) (plaintiff "cannot plausibly allege a material misrepresentation amounting to mail or wire fraud" based on the presence of a disclaimer).

Lastly, there were no misrepresentations because Defendants were transparent in dealing with Plaintiff. When Plaintiff challenged its electricity charges in 2011, the Trust not only provided Plaintiff with a copy of its FVS, but the Trust offered to have *another* survey conducted—an offer that Plaintiff rejected. (SMF ¶ 28.) And Plaintiff could have negotiated the method it would be charged for electricity, but never sought to do so. (*Id*. ¶¶ 8-10.) Further, no one ever told Plaintiff it had no right to audit its electricity charge or that it had waived such rights. (*Id*. ¶ 12.) Plaintiff thus can point to no evidence proving Defendants misrepresented or concealed any information about the Lease language, the publicly available FP&L General Service Rate applicable to Plaintiff, or the invoices with clear disclaimers. Thus, absent a misrepresentation, there can be no predicate acts of mail or wire fraud as required to demonstrate RICO liability. *See Bahamas Sales Ass., LLC v. Byers*, 2017 WL 3782804, at *18 (M.D. Fla. Aug. 31, 2017) (granting summary judgment for lack of misrepresentation where defendants disclosed allegedly fraudulent loans to plaintiffs and the public); *Renaissance*, 884 F. Supp. at 1146 (granting summary judgment on RICO claim where "Plaintiffs could have called [the utility company] and learned about metering and rates," which "are a matter of public record"); *Park Place Café*, 563 S.E.2d at 465 (granting summary judgment where "the record contain[ed] no evidence" of "any willful misrepresentations concerning the billing of electricity").

ii.     There Is No Proof of Intent for Mail or Wire Fraud.

A RICO scheme based on mail and wire fraud cannot be maintained absent proof that *each Defendant* had the "knowing intent to defraud" to commit the alleged predicate acts. *See Cont'l*

24

*Cas. Co. v. Cura Grp., Inc.*, 2005 WL 8155321, at *22 (S.D. Fla. Apr. 6, 2005); *see also Simpson*, 2021 WL 8939519, at *5-6 (granting summary judgment where record established defendants had "no agreement with the other Defendants to participate in the objective of the conspiracy or to commit two predicate acts"); *Beck-Ford Construction LLC*, 2018 WL 11422985 at *5 (wire fraud is a specific intent crime). Here, Plaintiff cannot prove the involvement of each Defendant in the purported scheme, let alone that they each acted with the requisite knowing intent to defraud Plaintiff. *See Simpson*, 2021 WL 8939519, at *5. Plaintiff similarly has no evidence showing each Defendant "had specific knowledge of the fraud" and participated in the conduct of the enterprise through the predicate offenses of mail and wire fraud. *Cont'l Cas. Co.*, 2005 WL 8155321, at *22. As shown above, there is no evidence that each Defendant had the intent necessary to commit mail or wire fraud. (SMF ¶¶ 49-56, 62-65, 83-86.) Therefore, Plaintiff's RICO claim fails for this additional reason as well.[16]

### 3. Plaintiff's Claims of Investment Injury and Conspiracy also Fail.

Absent a viable claim under § 1962(c), there can be no § 1962(a) claim for investment injury. *See Genord v. Blue Cross and Blue Shield of Mich.*, 2008 WL 5070149, at *4 (S.D. Fla. Nov. 24, 2008).[17] Likewise, because Plaintiff has failed to prove a violation of § 1962(a) or (c), it

---

[16] Plaintiff also cannot prove proximate cause under RICO. While Plaintiff's theory of proximate cause rests on an "inference of reliance" (*see* ECF No. 195 at 29), there is no evidence that Defendants made any representation concerning electricity. (SMF ¶¶ 8-12.) And the record fails to show that Plaintiff *relied* on any misrepresentation when entering into the Lease or paying invoices. Plaintiff's corporate representative testified that he was not focused on electricity costs when he signed the Lease and did not know that term was negotiable—despite having his lawyer review both the 2009 Lease and the 2014 Lease. (*Id.* ¶¶ 2-3, 6.) He further testified that he did not read all the invoices, including the disclaimer that the "Electricity" line item therein was an "estimate." (*Id.* ¶ 89.) Moreover, Plaintiff cannot prove that it would have refused to sign the Lease if it had known the "true nature" of the purported misrepresentation. *See Parker v. Ahmsi Ins. Agency Inc.*, 2019 WL 13178508, at *14 (S.D. Fla. Aug. 2, 2019). It is "utterly implausible" that Plaintiff would have behaved differently had Defendants "been clearer in [their] presentation and description" of the fees surrounding estimated electricity usage. *Ray*, 836 F.3d at 1350-51.

[17] Plaintiff also fails to prove a violation of § 1962(a) because this claim requires Plaintiff to "show an injury resulting from the investment of racketeering proceeds." *Super Vision*, 534 F. Supp. 2d at 1341. Plaintiff has no support that Defendants and Valquest "received money from a pattern of racketeering activity and invested that money in the enterprise." (FAC ¶ 118.) Plaintiff also has no support that its damages were caused by the investment in the alleged enterprise rather than by the underlying predicate acts. *See Super Vision*, 534 F. Supp. 2d at 1341.

cannot prove a *conspiracy* to violate those sections as required under § 1962(d). *See Flagg*, 257 F. Supp. 3d 1365. Therefore, Defendants are entitled to judgment on Count I in its entirety.

  **D.**  <u>The RICO, FDUTPA, and Unjust Enrichment Claims are Barred.</u>

   Plaintiff's RICO, FDUTPA, and unjust enrichment claims violate Section 24.13 of the Lease, which states that Plaintiff "shall look solely to the interest of the Landlord [*i.e.*, the Trust]" in the event it brings suit "with respect to any of the terms, covenants, conditions and provisions of [the] Lease." (SMF ¶ 48.) Thus, because Plaintiff is contractually barred from bringing claims against SPG, Inc., SPG, L.P., and M.S. Management, Counts I, II, and III should be dismissed. *See Marler v. U-Store-It Mini Warehouse Co.*, 416 F. App'x 49, 52 (11th Cir. 2011).

  **E.**  <u>The RICO, FDUTPA, and Unjust Enrichment Claims Are All Untimely.</u>

   **1.**  **Plaintiff's Claims Are Time-Barred.**

   RICO, FDUTPA, and unjust enrichment are subject to a four-year statute of limitations. *Coursen v. Shapiro & Fishman, GP*, 588 F. App'x 882, 885 nn.3 & 4 (11th Cir. 2014) (RICO, FDUTPA); *Beltran v. Vincent P. Miraglia, M.D., P.A.*, 125 So. 3d 855, 859 (Fla. DCA 2013) (unjust enrichment). The statute of limitations for RICO commences when "the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering." *Youngblood-West v. Aflac Inc.*, 796 F. App'x 985, 991 (11th Cir. 2019).

   Plaintiff asserts it could not have discovered the injuries due to Defendants' conduct until 2017 or later. (FAC ¶ 38.) This argument is incompatible with Plaintiff's own testimony, as Plaintiff claimed to be "on notice" of ongoing "mistakes" in its FVS and resultant injury from "inflated" charges in 2011—more than a decade ago. (SMF ¶ 25.) According to Plaintiff's own version of the event, the FVS from 2011 "had many mistakes and it included equipment I didn't have." (*Id.* ¶ 26.) Plaintiff complained and reached a self-described "settlement," resulting in a 50% reduction in Plaintiff's then outstanding charges. (*Id.* ¶ 27.) Plaintiff then willfully chose to

stop investigating the electricity charges based on a supposed "fear" that if another survey were undertaken, the resultant overcharges would be even greater—or that Defendants would "retaliat[e]" against Plaintiff for raising the issue. (*Id.* ¶ 31.) While Plaintiff's "fear" is entirely unfounded, Plaintiff's actions conclusively prove Plaintiff's awareness of its alleged injury. And despite this stated belief of an ongoing injury surrounding electricity charges, Plaintiff never raised any further issue from 2011 until it filed this lawsuit in 2020. (*Id.* ¶ 24.) That Plaintiff now claims these inflated electricity charges were part of a secret "racketeering" scheme nine years later is irrelevant. *Youngblood-West*, 796 F. App'x at 991 ("It matters not that [plaintiff] had an epiphany about the defendants' racketeering in 2016 . . . because she had long since known of or could have discovered her injuries."); *see also McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 752 (11th Cir. 2000); *Maale v. Kirchgessner*, 2010 WL 11506698, at *2, 7-8 (S.D. Fla. 2010).[18, 19]

### 2. Plaintiff Is Not Entitled to Equitable Tolling.

Plaintiff is also not entitled to rely on equitable tolling of the limitations period—nor to estop Defendants from asserting the limitations period as a defense—where it "failed to exercise due diligence in complaining about the purported pattern of racketeering despite having uncovered the defendants' activities [almost a] decade[] earlier." *Youngblood-West*, 796 F. App'x at 991

---

[18] That Plaintiff's "fear[s]" regarding overcharging for electricity persisted *after* 2011 further distinguishes this case from *CBL*. There, the plaintiff first thought it was being overcharged for electricity in 2009. *CBL*, 2019 WL 8273602, at *5. Later that year, the landlord installed a "test meter," and that installation "allayed the [plaintiff's] fears." *Id.* It was not until the plaintiff's electricity bills were cut in half that plaintiff realized the "extent of the alleged scheme." *Id.* Here, however, Plaintiff continued to believe its FVS was erroneous after 2011; thus, unlike *CBL*, there can be no credible argument that Plaintiff's "fears" were "allayed" to hide its discoverable injury. The operative limitation periods, therefore, expired by 2015—*i.e.*, five years before Plaintiff filed suit in 2020.

[19] Although Plaintiff contends in the FAC that § 6.2, titled "Tenant's share of Operating Costs," includes an audit waiver related to the Trust's electric bills, this argument is a red herring intended to inoculate Plaintiff from its clear statute of limitations issues. Section 6.2 does not relate to electrical service (which is instead governed by § 7.1); rather, it relates to "Landlord's operation, management, maintenance and repair of the Center"—*i.e.*, common area costs. (SMF ¶¶ 39-40.) This is a fixed charge that the parties agreed to during lease negotiations. (*Id.* ¶ 40.) This Court should not "rewrite the parties' contract and add meaning that is not present." *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1143 (11th Cir. 2019); *see also Azalea Park Utilities, Inc. v. Knox-Fla. Dev. Corp.*, 127 So. 2d 121, 123 (Fla. Dist. Ct. App. 1961). Indeed, Plaintiff itself has no facts that § 6.2 pertains to electricity charges or that the Trust included an audit waiver related to electricity. (SMF ¶ 53.)

(citation omitted); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) (a RICO plaintiff "who is not reasonably diligent may not assert 'fraudulent concealment'"). That is precisely the case here. Plaintiff settled the dispute regarding its electricity charges in 2011, received a 50% discount on its electricity line-item, yet the very next year Plaintiff's annual charge returned to the normal amount. (SMF ¶ 21.) This same pattern played out for *six more years* until Plaintiff vacated its space in February 2017. In the meantime, Plaintiff, with advice from counsel, signed *a new lease* that included the *same language* regarding electricity charges. This is the opposite of diligence. *See Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1252 (11th Cir. 2001) (equitable tolling is defeated when "the plaintiffs had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims."). Accordingly, the RICO, FDUTPA, and unjust enrichment claims are time-barred.

## F.    Plaintiff's FDUTPA Claim Fails as a Matter of Law.

Count III alleges violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against SPG, Inc., SPG, L.P., and M.S. Management. (FAC ¶¶ 127-35.) As an initial matter, this claim should be dismissed for the simple reason that Plaintiff failed to bring this claim against the proper entity, the Trust, which is the *only* Defendant that ever communicated with Plaintiff. The other three entities had no involvement with Plaintiff whatsoever; they do not manage TCBR, employ persons at TCBR, or communicate with tenants at TCBR. (SMF ¶¶ 50-56, 83-86.) Plaintiff's corporate representative, Mr. Mancinelli, admitted as much under oath, stating he never had "any communications" with any of these three Defendants, and he could not point to "any facts" to support the contention those entities made misrepresentations (or, for that matter, *any* representation) to Plaintiff. (*Id.* ¶ 51, 54-55) Plaintiff's claim should be dismissed as a matter of law. *Morchem Indus. v. Rockin Essentials*, 2021 WL 5014105, at *8 (S.D. Fla. June 16, 2021).

Even putting that fatal defect aside, Plaintiff's FDUTPA claim still fails because Plaintiff cannot prove Defendants committed a "deceptive act or unfair practice," or that Plaintiff suffered damages as a result. *Blair v. Wachovia Mortg. Corp.*, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012). Plaintiff was charged for electricity consumption in accordance with the plain and unambiguous terms of the Lease. Moreover, the parties were sophisticated commercial entities that engaged in arms-length negotiations regarding the terms of Plaintiff's tenancy at TCBR, a luxury shopping center with more than 200 tenants. Mr. Mancinelli, Plaintiff's corporate representative, had counsel to advise him. (SMF ¶¶ 2, 6.) If Plaintiff wanted to negotiate different terms for its electrical service charge, it could have done so, just like many of its fellow tenants did. (*Id*. ¶ 91.) *See also* Kove & Arnold § 18:69 ("The rate may or may not reflect actual usage or the rates charged to the landlord; this is clearly a negotiated item."). Regardless, Plaintiff's Lease not only specified precisely how it would be charged for electrical service using a methodology customary and widely accepted in the shopping mall industry (SMF ¶ 92), but Plaintiff, by its own admission, received the source documents used to calculate those very charges—including the FVS performed by Valquest to estimate Plaintiff's electricity usage and the Charge Backup Reports identifying the rate applied by the Trust (*id*. ¶ 33). No reasonable tenant in Plaintiff's position could be misled in such circumstances. Plaintiff also admitted it has no idea how much it suffered in damages as a result of Defendants' purported misrepresentations. (*Id*. ¶ 94) (**Q**: "[Y]ou can't tell me whether Cafe Gelato is seeking to recover $10 in damages or $10,000 in damages, is that right?" **A**: "That's right."). Accordingly, Plaintiff's FDUTPA claim should be dismissed as matter of law. *See Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015); *Angelo v. Parker*, 275 So. 3d 752, 756 (Fla. Dist. Ct. App. 2019).

**G.      Defendants Are Entitled to Summary Judgment on Plaintiff's Unjust Enrichment Claim.**

To prove a claim for unjust enrichment, Plaintiff must prove (1) that it conferred a benefit on SPG, Inc., SPG, L.P., and M.S. Management; (2) Defendants had knowledge of the benefit; (3) Defendants accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for Defendants to retain the benefit without paying fair value for it. *See eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 2022 WL 1320405, at *11 (S.D. Fla. May 2, 2022) (citation omitted). Here, Plaintiff's claim fails because there is no evidence that Plaintiff conferred any benefit on SPG, Inc., SPG, L.P., or M.S. Management, as the funds received from tenants were used by the Trust to fund the operations of TCBR only, and the other three Defendants did not receive or otherwise utilize those funds. (SMF ¶ 112.) The absence of this specific showing warrants summary judgment in favor of Defendants. *See Sagaan Devs. & Trading Ltd. v. Quail Cruises Ship Mgmt.*, 2013 WL 2250793, at *7 (S.D. Fla. May 22, 2013).[20]

**H.      The Trust Is Entitled to Summary Judgment on Its Counterclaim.**

On April 11, 2022, the Trust filed a compulsory counterclaim against Plaintiff for breach of contract because Plaintiff vacated of its premises prior to the end of its lease term and its corresponding failure to pay $318,197.42 in rent.[21] (ECF No. 154.) Because the facts supporting that claim are undisputed, the Trust is entitled to judgment as a matter of law on its counterclaim.

---

[20] Even assuming that Plaintiff had conferred a direct benefit on SPG, Inc., SPG, L.P., and M.S. Management (which it did not), Plaintiff cannot prove that it would be "inequitable" for Defendants to retain such benefit where the Lease expressly allowed Plaintiff to be charged at the cost that it would have been charged by FP&L for electrical service (not the landlord's). Moreover, it would not be inequitable for Defendants to retain such payments where Plaintiff received the benefit of electrical service at its leased premises in exchange for the amounts it paid to the Trust. The claim also fails because there is an express contract between Plaintiff and the Trust, and there is no equitable basis to hold the non-contracting Defendants liable for unjust enrichment absent proof of any direct benefit.

[21] The Trust also filed an alternative claim for unjust enrichment; however, because the Trust is entitled to judgment as a matter of law on its breach of contract claim, there is no need to address its unjust enrichment claim here.

1.      **Plaintiff Vacates Its Premises Owing $318,197.42 in Unpaid Rent.**

Plaintiff was required to make three different rent payments under the Lease: Minimum Rent, Percentage Rent, and Additional Rent. (SMF ¶¶ 95-99, 103.) These payments were due on the first day of each month throughout the duration of Plaintiff's 60-month lease term. (*Id*. ¶ 96.) If Plaintiff defaulted on those obligations, the Trust was authorized under § 18.2 to collect various costs, including "attorneys' fees" and "an amount equal to the difference between the Minimum Rent and all items of additional rents reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term and the then present rental value of the Premises for such period," both discounted to the then present worth. (*Id*. ¶ 104.)

Plaintiff vacated its premises in violation of § 8.2 on February 5, 2017. (JMF ¶ 12.) At that time, Plaintiff owed $318,197.42 in unpaid rent—$22,465.01 for rent in arrears, and $295,732.41 constituting the then-net present value of rent for the remaining duration of the lease term, from March 1, 2017 through May 31, 2020. (*Id*. ¶¶ 13-15, SMF ¶¶ 106-09.) On February 17, 2017, the Trust gave Plaintiff notice of its default and informed Plaintiff it would seek to recover "pre-judgment interest, court costs, and attorney fees in addition to the balance owing under the Lease." (JMF ¶ 17.) Thereafter, the Trust made a good-faith effort to mitigate its damages, ultimately collecting $130,480 in rent payments from three different tenants between March 1, 2017, and May 31, 2020. (SMF ¶ 110.)

2.      **The Trust Is Entitled to Judgment as a Matter of Law.**

"It has long been established by case law in Florida that a landlord has three options when faced with a tenant who defaults on rent payments and vacates the rented premises before the end of the term of the lease." *Hudson Pest Control, Inc. v. Westford Asset Mgmt., Inc.*, 622 So. 2d 546, 549 (Fla. Dist. Ct. App. 1993) (citations omitted). One of those options is to "retake possession for the account of the tenant, holding the latter responsible in general damages measured by the

difference between the stipulated rent and any amount the lessor is able to recover in good faith from his re-letting." *Id.* (citation omitted). That is precisely what happened here.

The record is undisputed that Plaintiff defaulted on its rent payments and vacated its premises before the end of the lease term. Plaintiff admitted under oath it has no "basis to dispute" and "can't deny" that it vacated on February 5, 2017, owing $318,197.42 in unpaid rent. (SMF ¶ 108.) The Trust's contemporaneous records confirm that at the time Plaintiff vacated TCBR, it owed an outstanding balance of $318,197.42—comprised of an accounts receivable balance of $22,465.01 and a present value of future rent of $295,732.41. (*Id.* ¶ 109.) Because these facts are undisputed, this Court should find Plaintiff liable for breach of contract for vacating its premises prior to the end of the lease term (breaching § 8.2) and failing to comply with its rental obligations (breaching §§ 1.1, 4.1, and 4.6). *See, e.g., 3455, LLC v. ND Properties, Inc.*, 631 F. App'x 701, 706 (11th Cir. 2015) (lease "unambiguously allowed [landlord] to collect rent after [tenant] vacated the premises through the end of the Lease term"). *Vital Pharms., Inc. v. Balboa Cap. Corp.*, 2016 WL 4479370, at *9 (S.D. Fla. Aug. 25, 2016) (same). The Trust's damages are undisputed as well. Applying the statutory prejudgment interest rate of 4.97% in effect at the time Plaintiff vacated the premises (SMF ¶ 111), and accounting for the $130,480 in offset rent the Trust recovered as part of its mitigation efforts (*id.* ¶ 110), the damages owed by Plaintiff total $251,401. This Court, therefore, should find that the Trust is entitled to damages in the amount of $251,401, plus attorneys' fees to be determined at a later date. *See 3455 LLC*, 2014 WL 3845696, at *11 (awarding unpaid rent and interest to landlord after tenant vacated premises prior to end of lease and reserving calculation of attorneys' fees for later date).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

Dated: August 12, 2022                **BOIES SCHILLER FLEXNER LLP**

*/s/ Ursula Ungaro*
Ursula Ungaro
Florida Bar No. 200883
uungaro@bsfllp.com
100 SE Second Street Suite 2800 M
Miami, FL 33131
Telephone: (305) 357-8432
Facsimile: (305) 539-1307

BERGER SINGERMAN LLP
Mitchell W. Berger
Florida Bar No. 311340
mberger@bergersingerman.com
Fred O. Goldberg
Florida Bar No. 898619
fgoldberg@bergersingerman.com
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

BLANK ROME LLP
James T. Smith (admitted *pro hac vice*)
Daniel E. Rhynhart (admitted *pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: 215-569-5500
Facsimile: 215-569-5555
Smith-jt@BlankRome.com
Rhynhart@BlankRome.com

*Attorneys for Simon Property Group, Inc.,*
*Simon Property Group, L.P., M.S. Management*
*Associates, Inc., and The Town Center at Boca*
*Raton Trust*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 12, 2022, a true and correct copy of the foregoing has been transmitted by electronic filing with the Clerk of the Court via CM/ECF, which will send notice of electronic filing to all counsel of record.

By:     */s/ Ursula Ungaro*
Ursula Ungaro